# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Trzeciak*, 2012 IL App (1st) 100259

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH TRZECIAK, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-10-0259 |
| Opinion filed | April 25, 2012 |
| Opinion withdrawn | May 7, 2012 |
| Opinion filed | May 9, 2012 |
| Rehearing denied | May 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where the testimony of defendant's wife about defendant's jealousy and abusive conduct contributed to his conviction for the first degree murder of a man defendant believed was having a relationship with his wife, defendant's conviction was reversed and the cause was remanded for a new trial, since the testimony should have been excluded under the marital privilege, its admission was not harmless, in that, without that testimony, there was limited evidence to support defendant's conviction, and defendant was deprived of a fair trial. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-CR-28283; the Hon. Angela M. Petrone, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal          Michael J. Pelletier, Alan D. Goldberg, and Jennifer L. Bontrager, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

Panel          JUSTICE SALONE delivered the judgment of the court, with opinion.
Presiding Justice Steele concurred in the judgment and opinion.
Justice Murphy dissented, with opinion.

## OPINION

¶ 1     Following a jury trial, defendant Joseph Trzeciak was convicted of first degree murder for killing Donald Kasavich with a firearm. Defendant was sentenced to 90 years' imprisonment consisting of 50 years for murdering Kasavich and a 40-year enhancement for the use of a firearm in the commission of the murder. The trial court further ordered defendant's sentence to run consecutive to a 10-year sentence imposed following his conviction for violating federal firearms laws. On appeal, defendant raises seven claims of error, arguing: (1) that the trial court erred in admitting testimony which should have been excluded as marital privilege; (2) that the trial court erred in admitting evidence regarding defendant's domestic abuse of his wife; (3) that the trial court erred in admitting evidence regarding defendant's flight; (4) that the trial court erred in refusing to allow a defense witness to testify regarding his knowledge of the alleged murder weapon; (5) that the trial court erred in forcing a venire member to return every day and watch the trial, after he stated that he could not be impartial; (6) that the State failed to prove beyond a reasonable doubt that he murdered Donald Kasavich; and (7) that defendant's sentence was excessive. For the reasons that follow, we reverse defendant's conviction and remand this matter for a new trial.

¶ 2                                    BACKGROUND[1]

¶ 3     Defendant was charged with murdering Donald Kasavich with a firearm. Kellee O'Nions discovered the dead body of Donald Kasavich in his Chicago trailer on June 29, 2004. O'Nions, who lived with Kasavich from time to time, arrived at the trailer in the evening to find the trailer in disarray and Kasavich dead, lying on his back. Police investigators noted broken glass on a shed outside of the trailer with blood on it. DNA testing later revealed that

---

[1]The facts addressed herein are limited to those relevant to our decision to reverse defendant's conviction and remand this case for a new trial and do not address all of the facts relevant to defendant's nondispositive claims on appeal.

the blood recovered from the window belonged to defendant. Inside the house the police recovered one fired .40-caliber Smith & Wesson bullet and three spent cartridges of the same caliber. Kasavich suffered three gunshot wounds to the head and had bruises to his hands, arms and legs. The medical examiner recovered one .40-caliber bullet from Kasavich's brain, along with several bullet fragments.

¶ 4     Prior to trial defendant filed several motions *in limine* requesting the exclusion of various pieces of physical and testimonial evidence. For the limited purposes of this appeal, we focus on defendant's motion to exclude testimony by his wife regarding communications between the two on the basis of marital privilege. After argument the trial court granted defendant's motion in part and denied it in part. Specifically, the trial court stated:

> "In Illinois, as in other states, the intent of marital privilege is to protect the sanctity of the marriage and to promote harmony between spouses. In this case, the marriage was in shambles. There was no harmony to protect. It is alleged there was a continuous pattern by defendant of violence towards his wife since the very beginning of their marriage, including beating her several times a week, kicking her while wearing boots, threatening her with guns and knives, tying her up and locking her in their home.

> * * *

> It is alleged defendant was committing violent behavior upon his wife, beating her and intimidating her with a firearm while he was making the contested threats to kill both her and Kasavich. The defendant's actions and statements are intertwined and cannot be separated without keeping highly probative evidence from the trier of fact. I do not believe that the Legislature of Illinois intended to protect the type of spousal abuse alleged here and to keep action and communications committed during such abuse privileged.

> The exclusion of the testimony of defendant's wife would be far more likely to frustrate justice than to promote marital harmony. The evidence also goes to the defendant's motive to kill Kasavich because defendant's wife allegedly turned to Kasavich for help in escaping from defendant. It suggests defendant did not intend the threats to be confidential. That he wanted his wife to convey them to Kasavich in order to convince Kasavich to stay way [*sic*] from her, and to dissuade Kasavich from helping her escape from defendant. It suggests the defendant himself was relying upon the fear produced by such threats rather than upon any confidential relationship of the marriage to achieve these goals.

> Therefore, defendant's wife may testify as to what she told Detective Butler during their conversation on July 20, 2004, which is the following: In April 2004, defendant threatened to kill Laura. Defendant tied her up, beat her, threw her in his pickup truck, had a gun, drove her to Donald Kasavich's trailer, pointed at the trailer and said he'd kill Kasavich and her, and then cut off Kasavich's dick and stick it in her mouth. She and defendant were both outside the trailer for a few minutes, then defendant drove her back to their home. Defendant continued to beat her to get her to confess. She had plans to leave with Kasavich. End of what she may testify to."

¶ 5     The court went on to exclude testimony regarding statements made by defendant to his

-3-

wife where she could not recall the date, and statements where defendant did not reference the victim. Defense counsel renewed their objection to all of the statements made by defendant to his wife and asked the trial court to reconsider its ruling. In denying the motion to reconsider, the trial court stated:

> "I will just note though that the defense is correct that the defendant was not charged with committing crimes against his spouse while the statement in question was being made by defendant, but I found that he was committing crimes against his spouse. That was the allegation anyway that will have to be testified to in court.

> * * *

> A crime was being committed against her when the statement that I read was allegedly said. That statement will not be allowed to be testified to unless Laura testifies to the abuse first."

¶ 6        During the *voir dire* one of the venire members explained to the trial court that he would find it difficult to be unbiased because of a family member's experience in the criminal justice system. Before the entire venire, the trial court refused to excuse the venire person and ordered him to attend every day of the trial as an observer and observe "how a fair trial operates." The trial court denied his motion and defendant proceeded to trial wherein the State presented several witnesses against defendant.

¶ 7                                    Trial Testimony

¶ 8        O'Nions testified that she accompanied the victim on June 25, 2004, when he visited Richard Roethler in Hammond, Indiana, and the victim agreed to buy a car from Roethler in exchange for a combination of money and cocaine. On June 26, 2004, O'Nions and the victim went to Pennsylvania and left the car at the victim's trailer. When they returned on June 28, 2004, the car was gone. The next morning O'Nions and the victim went to Roethler's house, where they learned that Roethler had taken the car back. O'Nions overheard the victim and Roethler arguing about the car and the cocaine. The victim left and O'Nions left some time thereafter, and she returned to the victim's trailer at approximately 1 p.m. O'Nions and the victim argued and he asked her to leave, which she did. At the time she left, the victim had no injuries and the trailer was intact. O'Nions testified that she knew defendant and that she knew the victim had bought crack cocaine from defendant in the past. Roethler was interviewed by Detective Kevin Eberle, of the Chicago police department, who concluded that he was not a suspect in the homicide.

¶ 9        Patricia Madigan testified that she knew defendant because he had sold her crack in the past. She also testified that on June 29, 2004, she called defendant to purchase crack from him. They made arrangements to meet at the intersection of 129th Street and Commercial Avenue, between 1:30 and 2 p.m. that day. Madigan stated that defendant failed to show at their designated meeting place, and when she called and spoke to him the second time he agreed to meet her at 4 p.m. that day at the same intersection. When she saw defendant at 4 p.m., his arm was bandaged and he explained that he had been involved in a police chase with the Hammond police department and cut himself on the glass of his truck. She recalls defendant asking her if she heard anything about a murder, and when she responded that she

had not, the two went and made a drug delivery. They then picked up his daughter and he asked his daughter if she had heard anything about a murder in a trailer park. Defendant's daughter responded that she had not, and the three of them went to defendant's house and ate dinner.

¶ 10 Defendant then packed a bag and went to Michael Lesko's house with Madigan. Defendant was driving Lesko's car and Madigan was familiar with Lesko because she had smoked crack at his house before. Once at Lesko's house defendant asked Madigan to wash his clothes and give him a haircut, which she did. After using drugs that defendant provided her, Madigan and defendant returned to his house in Lesko's car. They approached his house from the alley and defendant entered his house alone from the back. When he returned to the car, Madigan saw him place a bundle in the trunk. She thought the bundle contained at least one rifle and possibly more guns. Thereafter defendant drove with a pistol on his lap, while he threw bullets out the window. Eventually, they arrived at a landfill and defendant gave Madigan crack cocaine to smoke and told her to wait in the car. Defendant then walked to the Calumet River and Madigan heard a splash. When defendant returned he did not have the gun that was previously in his lap.

¶ 11 Defendant then took Madigan to an empty baseball field and left her there for approximately 10 minutes before he returned and the two went to the house of their mutual friend, Daniel Barnas. Once they arrived at Barnas' house, Madigan smoked crack in the basement, while defendant and Barnas spoke privately. She overheard defendant ask Barnas' permission to leave some things at his house. Then defendant brought the bundled contents into Barnas' house. Madigan could not identify what was in the blankets. After smoking more crack in Barnas' basement, Madigan and defendant returned to Lesko's home. When Madigan awoke in the morning, defendant was gone and so was Lesko's car. On July 28, Madigan contacted the Chicago police after learning of Kasavich's murder and recounted these events in a handwritten statement.

¶ 12 Laura Nilsen testified that she was the estranged wife of defendant. She stated that she knew the victim, and used to live with him, but denied ever having a sexual or romantic relationship with him. Nilsen admitted that she used to smoke crack with the victim and knew defendant as one of the victim's crack dealers. Nilsen testified that she and defendant began dating in November 2003 and were married January 16, 2004. She testified that during their marriage defendant beat her on a regular basis. He also supplied her with crack cocaine to support her daily drug habit. Defendant would beat her and often accuse her of having extramarital affairs with other men, including the victim, and he would attempt to force her to admit that she was having an affair through physical violence.

¶ 13 Nilsen testified that defendant beat her with his fists, his feet while wearing work boots, and a pistol, a photo of which she identified and was confirmed to be the murder weapon. She testified that defendant would tie her up using duct tape or rope and hit her with the gun. On several occasions he tied her up and left her that way while he left the house. The house was described as having multiple deadbolt locks on the doors, with keys required to open it from either side. There were also security cameras and a tall privacy fence in the back yard. The windows were tinted and the curtains were usually closed. Defendant would lock her in their bedroom or closets after physically abusing her.

¶ 14   Nilsen testified that one night in April 2004, she received a phone call and defendant became irate. She said that when she would receive phone calls defendant would often become jealous and violent. That night he beat and hogtied Nilsen with duct tape and put her in his truck. Once inside the truck, he drove Nilsen to the victim's trailer while continuing to beat her and accusing her of planning to leave him for the victim. She testified that she saw he had a gun with him. After they arrived at the victim's trailer defendant told her that he was going to kill her and the victim, cut his penis off and shove it into her mouth. Defendant then knocked on the victim's trailer door, but his knocks went unanswered. Thereafter, he returned to his truck and drove himself and Nilsen home. Defendant continued to abuse her and threaten her with the pistol while accusing her of cheating.

¶ 15   Nilsen went on to testify that on the evening of June 24, 2004, she received a telephone call from her sister and defendant began to beat her while she was on the phone. She quickly hung up the phone and tried to keep herself from crying while on the phone. Eventually defendant stopped and left the house. In the early hours of June 25, 2004, the police arrived at their house and Nilsen took the opportunity to escape, realizing that defendant had not taken her house keys from her, as he often did. That day she was taken to the police station in Hammond, Indiana, and interview and photographed. The photographs showed bruises on her face, arms, legs and back. After being interviewed and photographed she was taken to a hospital, where she was treated and released. She testified that she never saw defendant again after that day and went into hiding to avoid him. The photos of Nilsen's facial, arm and leg bruises were published to the jury.

¶ 16   Nilsen was also shown a photograph of the pistol confirmed by ballistics testing to be the murder weapon. She testified that the gun in the photo was the gun that defendant used to threaten her and beat her. She did not know the make or model of the gun, but testified that she knew that was the gun defendant kept with him "all the time." She was then shown a photo array of multiple similar model weapons and she stated that she was sure none of them was the gun defendant kept. She could not identify which of the guns in the photo were the same make and model as the gun defendant carried. She admitted telling the police about how defendant abused her, but not about his threats to the victim on the day they arrived at her house. A warrant was issued for defendant's arrest on charges of domestic battery.

¶ 17   On July 22, 2004, defendant was observed by Hammond police officer Matthew Porter leaving his Hammond, Indiana, home and parking at a nearby gas station. When the officer began calling in his location, defendant returned to his vehicle and sped away. Officer Porter turned on his lights and siren in an attempt to curb the vehicle, but defendant did not stop. After driving through several alleys and streets, defendant drove through the fence of a little league field and into Chicago. Officer Porter was ordered by his superiors to return to Hammond and not pursue defendant any further into Chicago. Defendant's vehicle was later recovered.

¶ 18   On July 26, 2004, Officer Porter observed a van pull into defendant's driveway. The van had a female driver and defendant was in the passenger's seat. Officer Porter ordered the occupants to stay in the vehicle and he called for back up. Defendant opened his passenger door and began yelling, "What's the problem?" to the officer. Defendant then appeared at the front of the van, leaning over the hood and pointing a silver pistol at the officer. He moved

around, keeping the female driver between him and the officer before running into the house. SWAT officers arrived and a standoff ensued. Defendant eventually surrendered once SWAT officers entered his house and deployed a flash-bang grenade. Federal and local law enforcement performed a search of defendant's home and recovered a .45-caliber handgun, but no drugs or large amounts of money were recovered.

¶ 19    A search of defendant's mother's home in Chicago yielded no evidence of illegal activity. Daniel Barnas' home was also searched, following Barnas' consent. There officers recovered a .40-caliber Glock handgun under a dresser in Barnas' bedroom; they also recovered a rifle under the stairs near the kitchen and a prescription bottle bearing the victim's name from a cabinet in Barnas' basement. The Glock was then taken into custody by federal agents and tested by the Illinois State Police crime lab. It was matched as the weapon used in the murder. After being tested, the weapon was returned to federal authorities and eventually destroyed, following defendant's conviction for federal gun charges. Additional physical evidence tested included fingernail scrapings under the victim's fingernails. The DNA testing of those scrapings excluded defendant and Roethler as contributors but could not exclude the victim.

¶ 20    Defendant called John Riggio, manager of a south suburban gun shop, to testify. He stated that he had bought, sold and traded guns since 1967. He testified that he was familiar with the size, shape and appearance of Glock pistols after having seen thousands of them. He testified that the .40-caliber Glock pistol and 9-millimeter Glock pistol have the identical body and frame. Defendant did not testify and the jury returned a verdict of guilty on all counts.

¶ 21    On appeal, defendant challenges several portions of the trial, including pretrial motions and jury selection. Because we find reversible error in the trial court's ruling on marital privilege testimony, we begin our analysis with defendant's claim of error regarding the privileged communications.

¶ 22                                    ANALYSIS

¶ 23    Defendant contends that his conduct and his statement to his wife made in private should not have been admitted as evidence. The State responds that it was within the sound discretion of the trial court to determine the admissibility of that testimony and the trial court's reasoning shows that it did not abuse that discretion. We review the decision to admit or exclude evidence for an abuse of discretion and will not overturn that decision absent a showing of abuse of that discretion. *People v. Gibson*, 205 Ill. App. 3d 361, 369 (1990).

¶ 24    Section 115-16 of the Code of Criminal Procedure of 1963 prohibits testimony "as to any communication or admission made by either of them to the other or as to any conversation between them during marriage" with limited exception regarding offenses against each other, spousal abandonment and offense against children. 725 ILCS 5/115-16 (West 2006). In Illinois, unless there is evidence to the contrary, there is a presumption that interspousal communications are intended to be confidential. *People v. Sanders*, 99 Ill. 2d 262, 267 (1983). Acts as well as statements are regarded as communications for the purposes of marital privilege. *People v. Burton*, 6 Ill. App. 3d 879, 887 (1972).

¶ 25    Here, the evidence at trial showed that defendant violently abused Nilsen and made threatening statements in the confines of their home. The record further shows that defendant restrained Nilsen and locked her inside their house as part of his ongoing abuse of her.

¶ 26    Initially, we note that none of the exceptions noted in the statute are applicable in this case. There were no children involved in this case. Defendant was not charged in Illinois for his domestic battery of his wife, nor was there a claim of spousal abandonment against him. Indeed, the record reflects that Nilsen left defendant, once she felt safe to do so. Thus, under Illinois law, the presumption that the interspousal communications between them are privileged should apply. We note that the case law which the trial court relied on in reaching the conclusion that this communication was not what the Illinois legislature intended to protect as privileged was exclusively from outside Illinois. We disagree.

¶ 27    As our supreme court recently stated, "[u]nless the language of the statute is ambiguous, this court should not resort to further aids of statutory construction and must apply the language as written." *People v. Young*, 2011 IL 111886, ¶ 11. In addition, our supreme court explained in *Sanders* that "[t]he expansion of existing testimonial privileges and acceptance of new ones involves the balancing of public policies which should be left to the legislature." *Sanders*, 99 Ill. 2d at 271. As indicated above, there is no "bad marriage" exception to marital privilege. Indeed, the legislature is aware of the terrible circumstances surrounding domestic violence in a marriage, as indicated by the exception to spousal privilege where one spouse is charged with domestic violence against the other. 725 ILCS 5/115-16 (West 2010). Even with the legislature being keenly aware of the problem of domestic violence, it created no "bad marriage" exception.

¶ 28    Here, we find no ambiguity in the language of the statute. The statute is prohibitive of testimony regarding communications and admissions made as to "any conversation between them during the marriage." It is undisputed that the communications had between Nilsen and defendant were during their marriage and were made privately. While we recognize that the marriage between defendant and Nilsen was not harmonious, the legislature did not see fit to require marital harmony be present in order to preserve the privilege.

¶ 29    The plain language of the statute, our supreme court's general instructions regarding statutory interpretation, and our supreme court's instructions regarding this statute specifically limit the available exceptions to the statutory privilege to those enumerated by the legislature. Thus, the trial court should have applied the law and excluded the evidence of abuse and defendant's threats against Nilsen and the victim. Under these circumstances, we find that the trial court abused its discretion by admitting the testimony regarding the privileged statements.

¶ 30    In Illinois, the admission of evidence in violation of marital privilege deprives defendant of a fair trial where it contributes to a guilty verdict. *People v. Murphy*, 241 Ill. App. 3d 918, 925 (1992). Here, the record clearly establishes that Nilsen's testimony regarding the abuse and defendant's statements to her contributed to defendant being found guilty. The evidence at trial was that days before the victim's murder, the victim was arguing with another man over being dispossessed of his vehicle. Moreover, the murder weapon and the victim's prescriptions were found in another man's home. Absent Nilsen's testimony regarding

defendant's statements of jealousy of her relationship with the victim, along with his threats against her and the victim, there is limited evidence to support defendant's murder conviction. We find that Nilsen's testimony regarding defendant's motive for killing Kasavich contributed to his conviction. Thus, the admission of that testimony was not harmless where it denied defendant a fair trial. *People v. Muzard*, 210 Ill. App. 3d 200, 212 (1991).

¶ 31 Accordingly, we need not address the remainder of defendant's claims of error. Instead, we reverse and remand this matter for a new trial consistent with our ruling.

¶ 32 Reversed and remanded.

¶ 33 JUSTICE MURPHY, dissenting:

¶ 34 I respectfully dissent. I disagree with the majority that the trial court erred in admitting defendant's statements to his wife and conduct toward her into evidence. I do not believe there was any intention for the statement or actions to remain private. Nor do I find that the actions and statements by defendant fall within the scope of protections of the marital privilege or the public policy supporting the legislature's intent in enacting that provision.

¶ 35 As addressed by the majority, section 115-16 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-16 (West 2010)) prohibits testimony by a spouse regarding communication or admission made by one spouse to the other during marriage. I understand the majority's difficulty with the trial court's analysis, particularly its reliance on case law from foreign jurisdictions in support of its conclusion that defendant's statements fell outside of the marital privilege. This case falls within an area with sparse authority, but I believe that the facts of this case support the trial court. Further, beyond the foreign cases cited by the trial court, review of the relevant statutory provisions and our courts' discussion of this issue supports the trial court's finding.

¶ 36 I believe that our supreme court's discussion of the marital privilege in *People v. Sanders*, 99 Ill. 2d 262, 270 (1983), is instructive to how we should consider the privilege itself, legislative intent and policy, and foreign case law in interpreting the reach of the privilege and any exception. Noting that the marital privilege results from a policy not of safeguarding the quality of evidence at trial, but from a policy of promoting family harmony, the *Sanders* court quoted the United States Supreme Court:

" 'Testimonial exclusionary rules and privileges contravene the fundamental principle that " 'the public ... has a right to every man's evidence.' " [Citation.] As such, they must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." [Citation.]' " *Id.* (quoting *Trammel v. United States*, 445 U.S. 40, 50 (1980)).

¶ 37 In *Sanders*, the court declined to extend any privilege to conversations between parent and child. The court noted that the source of all privileges in Illinois, with the exception of the attorney-client privilege, was statutory and adding a privilege should be done by the

legislature, following a balancing of public policies. *Id.* at 270-71. Therefore, the court rejected defendant's argument it should apply the privilege to include the child. The court did conclude that, despite the presumption that interspousal communications are intended to be confidential, the fact that one of the conversations between the married couple occurred in front of their child led to the conclusion that it was not intended to be confidential and, therefore, was not protected by the privilege. *Id.* at 270.

¶ 38    I find that the facts support the trial court's refusal to apply the marital privilege in this instance. Despite the presumption of confidentiality under *People v. Murphy*, 241 Ill. App. 3d 918, 924 (1992), defendant's actions and words that he claims were improperly admitted, at their core, demonstrate that he did not intend they remain confidential. According to the testimony at trial, defendant beat Nilsen, taped her up, removed her from a private setting and put her in his truck, then drove to the victim's home, voiced his threats toward Nilsen and the victim, then left the truck and banged on the victim's door.

¶ 39    I agree with the State that these actions demonstrate defendant's plain desire that his thoughts, and threats, not remain confidential to overcome that presumption. This behavior deviated from the evidence of defendant's other beatings of Nilsen and demonstrated his desire to make his sentiments known to the victim. Strictly construing the privilege as discussed in *Sanders*, I would hold that the trial court properly determined that this exchange falls outside the parameters of the marital privilege and correctly allowed Nilsen's testimony on motive.

¶ 40    Since I also concur with the trial court's analysis of this issue, I would add that this case exemplifies the need to revisit the provisions of section 115-16 of the Code of Criminal Procedure of 1963. The majority notes that in this case, there were no children involved, no charges of domestic battery and no claim of spousal abandonment. In fact, the majority points out that once she felt safe to leave defendant, Nilsen safely moved away from defendant. Because of these facts, the majority reasons that the stated exceptions to the marital privilege were not met and the statements by defendant were protected by the privilege.

¶ 41    However, implicit in this statement is acceptance that the very reason for the creation of the privilege did not exist here–there clearly was no marital harmony to protect. While it does not appear that defendant faced domestic abuse charges in Illinois, the record indicates that a domestic battery arrest warrant had been issued in Hammond, Indiana, related to his abuse of Nilsen. Further, the concern supporting the privilege that a spouse will be forced to testify against a spouse is obviously not of issue in this case.

¶ 42    Ample support is evident from other evidentiary provisions as well as the general policy espoused elsewhere by the legislature concerning the need to prevent domestic violence to provide guidance in defining the exclusion to the marital privilege. For example, the physician-patient privilege and exceptions provided by statute specifically exclude information "in trials for homicide when the disclosure relates directly to the fact or immediate circumstances of the homicide." 735 ILCS 5/8-802 (West 2010). This privilege similarly serves the purpose of ensuring a free and open exchange between two people while excluding certain information that, if kept confidential would protect the key policy interest

in preventing homicide. Defendant's behavior certainly is not to be protected and excluding testimony concerning that behavior would frustrate the interests of justice.

¶ 43    This is a troublesome case in that the facts cry out to enable the battered wife to testify as to her husband's motive. The trial court understood this and ably screened the proposed testimony, allowing in only evidence as to motive. I look particularly at the incident where defendant beat his wife, bound her with duct tape, took her outside and placed her in his truck and then drove to the victim's trailer where he got out and pounded on the victim's door. This was done in public, in plain sight. By these actions defendant waived the marital privilege. While I find reason to affirm the trial court, I also would encourage an additional exception in section 115-16 for homicide cases where a spouse voluntarily testifies.