# Illinois Official Reports

## Supreme Court

---

### *People v. Trzeciak*, 2013 IL 114491

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JOSEPH TRZECIAK, Appellee. |
| Docket No. | 114491 |
| Opinion filed<br>Rehearing denied | November 15, 2013<br>February 21, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Statements made by a husband to his wife while he was physically abusing her were not confidential, and the marital privilege did not bar their admission at his trial for the murder of another person. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Angela Munari Petrone, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.<br><br>Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Jennifer L. Bontrager, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee. |

Justices                      JUSTICE BURKE delivered the judgment of the court, with opinion.
Chief Justice Garman and Justices Freeman, Thomas, and Kilbride concurred in the judgment and opinion.
Justice Theis specially concurred, with opinion, joined by Justice Karmeier.
Justice Theis dissented upon denial of rehearing, with opinion, joined by Justices Kilbride and Karmeier.

# OPINION

¶ 1      Defendant, Joseph Trzeciak, was convicted of the murder of Donald Kasavich. The appellate court, with one justice dissenting, reversed defendant's conviction, holding that a threat made by defendant to his wife, Laura Nilsen, that he would kill her and Kasavich, was inadmissable under Illinois' marital privilege, section 115-16 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-16 (West 2010)), and that defendant was prejudiced by the statement's introduction at trial. 2012 IL App (1st) 100259. For the reasons set forth below, we find that the threat was not barred by the marital privilege and, therefore, reverse the judgment of the appellate court.

¶ 2                               BACKGROUND

¶ 3      On June 29, 2004, the victim, Donald Kasavich, was found dead in his trailer in the Hegewisch area of Chicago. Kasavich suffered three gunshot wounds to the head. His trailer was in disarray and a window had been broken. Defendant, a resident of Hammond, Indiana, was subsequently charged with Kasavich's murder.

¶ 4      Prior to trial, defendant filed several motions to exclude various pieces of evidence and testimony, including a motion to exclude evidence of his prior acts of domestic violence against his wife, Laura Nilsen, and a motion to exclude confidential communications made to her. With respect to the former motion, defendant sought to exclude his general pattern of violence and abuse toward Nilsen; evidence that in April of 2004, defendant beat her and then drove her to Kasavich's trailer; and evidence that he was jealous Nilsen was going to run off with Kasavich and, therefore, beat her. With respect to the latter motion, defendant sought to exclude a statement made by him to Nilsen in April of 2004, in which he threatened to kill both her and Kasavich.

¶ 5      The circuit court of Cook County denied in part and allowed in part defendant's motion to exclude evidence of defendant's violence against Nilsen. The court ruled that some evidence of domestic violence was relevant to defendant's motive for killing Kasavich and also relevant to intent. The trial court, however, limited the evidence that was admissible, finding that the admission of all of the evidence would be more prejudicial than probative.

- 2 -

¶ 6 The trial court denied defendant's motion to exclude certain testimony from Nilsen based on the marital privilege. The trial court framed the issue as:

> "whether or not [the] marital privilege prohibits the testimony of defendant's wife against defendant in defendant's trial for a murder committed against a third party, Donald Kasavich, as to defendant's actions toward his wife, and as to defendant's contemporaneous threats to kill his wife and Kasavich when defendant was not charged with committing an offense against his wife."

After discussing several Illinois cases as well as cases from other jurisdictions, and noting the purpose underlying the marital privilege, the circuit court concluded that our legislature could not have intended to protect the type of spousal abuse alleged in this case or the communications made during such abuse as privileged. The court further found that defendant's conduct in April 2004 and his threat was admissible to show defendant's motive to kill Kasavich because Nilsen allegedly turned to Kasavich for help in escaping from defendant. The court also found that defendant did not intend the threat to be confidential in that he expected Nilsen to convey it to Kasavich to convince Kasavich to stay away from Nilsen and to dissuade him from helping her escape from defendant. The court reasoned that defendant relied upon the fear produced by such threats rather than upon any confidential relationship of the marriage. Accordingly, Nilsen was permitted to testify regarding what she told a detective on July 20, 2004, specifically:

> "In April 2004, defendant threatened to kill Nilsen. Defendant tied her up, beat her, threw her in his pickup truck, had a gun, drove her to Donald Kasavich's trailer, pointed at the trailer and said he'd kill Kasavich and her, and then cut off Kasavich's dick and stick it in her mouth. She and defendant were both outside the trailer for a few minutes, then defendant drove her back to their home. Defendant continued to beat her to get her to confess."

¶ 7 At trial, Kellee O'Nions testified that she discovered Kasavich's dead body on June 29, 2004. O'Nions stated she had lived with Kasavich from time to time for several years. O'Nions admitted she had been a crack cocaine addict for more than 20 years but stated she no longer used it. O'Nions also stated that she and Kasavich had taken drugs together and she was aware Kasavich often purchased crack from defendant.

¶ 8 O'Nions testified that she accompanied Kasavich on June 25, 2004, to Richard Roethler's home in Hammond. O'Nions had known Roethler for approximately 20 years and introduced Kasavich to him because Kasavich was looking for a car to buy and Roethler had a car to sell. Kasavich agreed to buy a red car from Roethler in exchange for a combination of money and cocaine.

¶ 9 On June 26, O'Nions left with Kasavich to go to Pennsylvania to visit some of Kasavich's family. They drove Kasavich's van and left the red car parked at his trailer. When they returned on June 28, the red car was gone. The next morning O'Nions and Kasavich went to Roethler's house, where they learned Roethler had taken the car back. O'Nions overheard Kasavich and Roethler arguing about the car and the cocaine. Kasavich left, but O'Nions remained to talk to Roethler about giving the car back to Kasavich. After Roethler refused, O'Nions returned to Kasavich's trailer. O'Nions and Kasavich argued and he asked her to leave, which she did. At

the time she left, Kasavich had no injuries, the trailer was intact, and the window was not broken.

¶ 10    Roethler was later interviewed by Chicago police Detective Kevin Eberle, who concluded Roethler was not a suspect in Kasavich's homicide. In addition, Roethler was excluded as a suspect based on physical evidence taken from the victim and the crime scene.

¶ 11    Patricia Madigan testified she met defendant through a mutual friend, Danny Barnas.[1] She bought crack cocaine from defendant, which she had used on a daily basis in 2004. However, in 2009, when the trial took place, she testified she had been clean for three or four years. Madigan did not know Kasavich.

¶ 12    Madigan testified that, on June 29, 2004, she called defendant to purchase crack from him. They made arrangements to meet at the intersection of 129th Street and Commercial Avenue in Chicago, between 1:30 and 2 p.m. that day. Defendant failed to show up. Madigan again called defendant and when she finally reached him, he agreed to meet her at 4 p.m. at the same intersection. Madigan drove Michael Lesko's car to the designated location. When she saw defendant, his arm was bandaged and bloody and his clothes had blood on them. Defendant told Madigan he had been involved in a police chase with the Hammond police department and cut himself on glass from his truck.[2] Defendant then asked Madigan if she had heard anything about a murder at a trailer court. She responded she had not.

¶ 13    Madigan drove defendant to another drug delivery, then defendant took over driving Lesko's car, and they picked up his daughter. After his daughter got into the car, defendant asked her if she had heard anything about a murder in a trailer court. When she responded she had not, defendant told her to "mind her own fuckin' business." The trio then went to Burger King and back to defendant's house to eat.

¶ 14    When they got back to defendant's house, he packed an overnight bag and he and Madigan went to Lesko's house. At Lesko's house, defendant asked Madigan to wash his clothes and give him a haircut, which she did. Defendant also bathed, after which Madigan rebandaged his arm. While waiting for defendant's clothes to dry, Madigan, defendant and Lesko used drugs.

¶ 15    Thereafter, Madigan and defendant returned to his house in Lesko's car. Defendant exited the car, walked down an alley and went over a fence into his yard. When he returned approximately 5 to 10 minutes later, he threw items wrapped in a blanket over the fence. According to Madigan, the items appeared to be rifles or guns. Defendant put the guns in the trunk. Defendant then drove down 130th Street with a pistol on his lap, throwing bullets out the window. Subsequently, defendant drove to a landfill by the Calumet River. Defendant gave Madigan crack cocaine to smoke and told her not to watch what he was doing. Defendant exited the car and Madigan heard a splash. When defendant returned, he did not have the gun that was previously on his lap.

_____

[1]Barnas was deceased at the time of defendant's trial.

[2]Testimony was offered at trial from a Chicago police detective that there was no external damage to defendant's truck or any broken glass.

- 4 -

¶ 16    The two went to the house of their mutual friend, Barnas. Once they arrived at Barnas' house, Madigan smoked crack in the basement while defendant and Barnas spoke privately. She overheard defendant ask Barnas' permission to leave some things at his house. Defendant then brought the blanket from the trunk into Barnas' house. After smoking more crack in Barnas' basement, Madigan and defendant returned to Lesko's home. The two stayed the night and in the morning, defendant left with Lesko's car. Madigan called her mother to pick her up and she then learned about Kasavich's murder.

¶ 17    The next time Madigan saw defendant was at Barnas' house sometime in July. She heard defendant asked Barnas if he could remove the rifles he had left there. At this time, the rifles were in a golf bag. On July 28, Madigan spoke with a Chicago police detective and recounted these events in a handwritten statement. She also testified before a grand jury.

¶ 18    Michael Lesko testified that he too used crack cocaine in 2004 and knew both defendant and Madigan. In 2004, he owned a white Oldsmobile and would lend it to people, including Madigan and defendant. According to Lesko, between 6 and 8 p.m. on June 29, he was sitting in his kitchen when Madigan and defendant walked in unannounced. Defendant's arm was bandaged with some type of cloth and there was blood on his clothes. Defendant told Lesko he had a couple too many beers, fell down, and injured his arm. Defendant asked if he could use Lesko's bathroom to clean up, which Lesko found unusual since defendant had never made such a request before. While defendant took a bath, Madigan washed his clothes. When defendant was finished with his bath, Madigan rebandaged defendant's arm and then cut his hair, which was also unusual to Lesko. The three talked for a bit and then Lesko went to bed. The next day defendant left in Lesko's car.

¶ 19    Lesko testified that when he got his car back a day or two later, it was very clean. Lesko testified that in July, the police showed up at his house and asked for consent to search his vehicle. He gave the police consent and they took his car.

¶ 20    Laura Nilsen testified she was the estranged wife of defendant. The trial was the first time she had seen defendant since June 24, 2004. Nilsen stated she knew Kasavich and used to live with him, but she denied having a sexual or romantic relationship with him. Nilsen admitted that in 2003 to 2004, she smoked crack daily. When she lived with Kasavich, they would take drugs together, which they often purchased from defendant.

¶ 21    Nilsen testified that she and defendant began dating in November 2003 and were married in January 2004. After she moved in with defendant in Hammond, he immediately became very abusive toward her, beating her daily. Nilsen testified that defendant beat her with his fists, kicked her while wearing work boots, hit her with a gun, tied her up using duct tape or rope, and locked her in the bathroom and closet.

¶ 22    Nilsen described defendant's house as having multiple deadbolt locks on the doors, with keys required to open them from both sides. A two-by-four board was also propped against the front door to block it. There were security cameras at both the front and rear of the house, as well as a tall privacy fence surrounding the yard. The windows were tinted and the curtains were usually closed.

¶ 23    Nilsen testified that one night in April 2004, defendant became irate and violent because she received a phone call, as he always did. They fought, and while beating her, defendant accused her of planning to leave with Kasavich. She denied these accusations, but defendant tied her up and put her in his truck. Once in the truck, he drove to Kasavich's trailer, which was approximately five minutes from defendant's home, while continuing to beat her and accusing her of planning to leave him. Nilsen testified that defendant had a gun with him and when they arrived at Kasavich's trailer, defendant told her "he was going to cut [Kasavich's] dick off and put it in [her] mouth and then kill [them] both." Defendant exited the truck and knocked on Kasavich's door, but his knocks went unanswered. Defendant then returned to the truck and drove home.

¶ 24    After this incident, defendant repeatedly accused Nilsen of planning to leave with Kasavich and of cheating and having affairs with others. He regularly tried to beat a confession out of her, often putting his gun in her mouth while threatening her.

¶ 25    Nilsen further testified that on the evening of June 24, 2004, she received a telephone call from her sister and defendant began to beat her while she was on the phone. She hung up as quickly as possible. Eventually defendant stopped beating her and left the house.

¶ 26    In the early hours of June 25, the Hammond police arrived at the house. Because the pit bulls were barking, the police yelled at her to put them away. As she was doing so, she noticed defendant had left the house keys. She let herself out and went with the police to the Hammond police station, where she was interviewed and photographed. The photographs showed bruises, both new and old, on her face, arms, legs, and back. After being interviewed and photographed, she was taken to a hospital. Thereafter, she went to her mother's house for a day and then went into hiding from defendant. Nilsen testified that she did not talk to Kasavich after this day and eventually learned he had been murdered. After the incident on June 24, a warrant was issued for defendant's arrest on charges of domestic battery.

¶ 27    Other evidence was presented at trial. Specifically, a piece of glass with blood on it was recovered from a shed outside of Kasavich's trailer. Forensic testing showed the blood was defendant's. Following defendant's arrest, a consensual search was made at Barnas' home. Officers recovered a .40-caliber Glock Model 27 handgun, a rifle, and prescription bottles bearing Kasavich's name.

¶ 28    The handgun was tested by the Illinois State Police Crime Lab and was identified as the weapon used to kill Kasavich. Three fired cartridges and one live cartridge from a .40-caliber gun were recovered inside Kasavich's trailer. Also, the medical examiner testified that one .40-caliber bullet was recovered from Kasavich's brain. All of these items were confirmed to have come from the recovered handgun.[3]

---

[3]After the handgun was tested, it was returned to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). In September 2008, unbeknownst to the Chicago police department, the ATF destroyed the gun as a matter of routine since a federal firearms case against defendant was complete. Two photographs of the handgun had been taken before its destruction and were used at trial.

¶ 29 At trial, Nilsen was shown a photograph of the handgun. She testified the gun in the photo was the gun defendant used to threaten her and beat her. She did not know the make or model, but knew it was the gun defendant kept with him "all the time."

¶ 30 Detective Eberle of the Chicago police department testified that the police began looking for defendant in connection with Kasavich's murder on July 3 after they received an anonymous tip.

¶ 31 Hammond police officer Matthew Porter testified that on July 22 he was aware there was a warrant for defendant's arrest and was surveilling defendant. At approximately 12:30 a.m., Porter observed defendant pull out of his driveway with his lights off, pull into a gas station across the street, and get out. Porter drove up behind defendant. As Porter called in his location, defendant jumped back into his vehicle and sped away. Porter activated his lights and siren but defendant did not stop. After driving through several alleys and streets, defendant drove through a fence, across a Little League field, and then through a second fence. Defendant then drove through Hammond into Chicago, with Porter in pursuit. Approximately three miles into Chicago, Porter was ordered by his superiors to return to Hammond and end his pursuit of defendant.

¶ 32 On July 26, Porter was still searching for defendant. At approximately 1:30 a.m., as he was driving down an alley parallel to defendant's driveway, he observed a van pull out of defendant's driveway and then pull back in. The driver was a female and defendant was in the passenger's seat. Porter pulled behind the van, activated his lights, and called for backup. Porter then exited his vehicle, remaining next to it with his firearm drawn, and ordered the occupants to stay in the vehicle.

¶ 33 Defendant opened the passenger door and began yelling, "What's the problem?" Porter again told defendant to remain in the vehicle. However, defendant jumped out and ran toward the front of the van. Defendant then leaned over the front hood of the van and pointed a silver pistol in Porter's direction. Defendant continued to move around, keeping the female driver between himself and Porter. Porter ordered defendant several times to get to the ground and drop his gun. Instead, defendant began running down the alley beside his garage toward his house.

¶ 34 Several officers arrived and set up a perimeter around defendant's house. SWAT officers also arrived. At this point, there were approximately 30 police personnel present on the scene, including Hammond police officers, special agents from the ATF, and ATF task force agents, as well as other state and local authorities and negotiators. Even after teargas was shot into every window of defendant's house, he refused to come out. The officers then made the decision to go in and the rear door was rammed down.

¶ 35 Lieutenant Ralph Bogie of the Hammond police department entered the house first. Bogie testified that when he entered, immediately in front of him was a staircase to the basement. His flashlight illuminated a person pointing a silver gun at him at the foot of the stairs. Bogie yelled to the person between six to eight times to drop the gun. Finally, Bogie heard a metal object hit the floor. Defendant was subsequently arrested.

¶ 36    Based on all of the above evidence, the jury found defendant guilty of first degree murder. Defendant was sentenced to 50 years' imprisonment for the murder conviction and 40 years' imprisonment for the firearm enhancement, to run consecutively. These sentences also were to run consecutively to a 10-year federal firearm sentence defendant was already serving.

¶ 37    Defendant appealed, raising seven challenges. The appellate court addressed only the first issue, whether Nilsen's testimony should have been excluded under the marital privilege. The appellate court found that none of the exceptions in section 115-16 were applicable. 2012 IL App (1st) 100259, ¶ 26. Therefore, the appellate court concluded the communications between Nilsen and defendant were protected by the marital privilege because they were made during their marriage and were made privately. Thus, the trial court should have applied the privilege and excluded the evidence of abuse and defendant's threats against Nilsen and the victim. 2012 IL App (1st) 100259, ¶¶ 28-29. The appellate court further held that the record clearly showed Nilsen's testimony contributed to defendant being found guilty and therefore reversed and remanded for a new trial. Justice Murphy dissented, reasoning that defendant did not intend for his conduct and threat to remain confidential.

¶ 38    We granted the State's petition for leave to appeal.

¶ 39                                  ANALYSIS

¶ 40    This case requires us to determine the scope of Illinois' marital privilege, which is found in section 115-16 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-16 (West 2010)). The primary objective of statutory construction is to ascertain and give effect to the legislature's intent. *Citizens Opposing Pollution v. ExxonMobil Coal U.S.A.*, 2012 IL 111286, ¶ 23. The best indicator of the legislature's intent is the language of the statute itself, given its plain and ordinary meaning. *Id.* It is axiomatic that when construing a statute, we "cannot allow formality to trump substance where the result would be contrary to the purposes for which the statute was enacted and lead to consequences which the legislature could not have intended." *Township of Jubilee v. State of Illinois*, 2011 IL 111447, ¶ 35. A cardinal rule of statutory construction is that a court can consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. *People v. Gutman*, 2011 IL 110338, ¶ 12; *People v. Garcia*, 241 Ill. 2d 416, 421 (2011). In interpreting a statute, we presume the legislature did not intend absurdity, inconvenience, or injustice. *Citizens Opposing Pollution v. ExxonMobil Coal U.S.A.*, 2012 IL 111286, ¶ 23.

¶ 41    In Illinois, one spouse may testify for or against the other spouse in criminal cases. However, section 115-16 of the Code provides that neither "may testify as to any communication or admission made by either of them to the other or as to any conversation between them during marriage, except in cases in which either is charged with an offense against the person or property of the other." 725 ILCS 5/115-16 (West 2010). The purpose of this privilege, derived from common law, is to promote marital harmony and stability. *People v. Foskey*, 136 Ill. 2d 66, 94 (1990). See also *Jaffee v. Redmond*, 518 U.S. 1, 11 (1996); *Trammel v. United States*, 445 U.S. 40, 53 (1980). It is intended to further marital harmony, mutual understanding and trust by encouraging full disclosure, free communication, and

confidential communications between spouses. *People v. Simpson*, 39 Ill. App. 3d 661, 669 (1976), *rev'd on other grounds*, 68 Ill. 2d 276 (1977). See also 81 Am. Jur. 2d *Witnesses* § 284, at 307 (2004) ("The purpose of this doctrine is to promote and encourage the utmost confidence between spouses and, thus, aid in the preservation of the marriage status."); McCormick on Evidence § 86, at 340 (John W. Strong ed., 5th ed. 1999) ("The argument traditionally advanced in support of the marital communications privilege is that the privilege is needed to encourage marital confidences, which confidences in turn promote harmony between husband and wife."); 8 John Henry Wigmore, Evidence § 2332, at 642 (McNaughton rev. ed. 1961) ("[t]he policy which should lie at the foundation of every rule of privileged communications *** appears to be satisfied" in the case of spousal communications: *i.e.*, the communications originate in confidence, the confidence is essential to the relation, the relation is a proper subject of encouragement by the law, and the injury that would inure to the relation by disclosure probably exceeds the benefit that would result from ignoring the privilege in the "judicial investigation of truth").

¶ 42     We have rejected the argument that section 115-16 applies to "any" conversation or communication and, instead, have held that the statutory privilege, like the similar common law privilege, applies only to communications which are intended to be confidential. *People v. Palumbo*, 5 Ill. 2d 409, 415 (1955). See also *Foskey*, 136 Ill. 2d at 89; *People v. Sanders*, 99 Ill. 2d 262, 267 (1983). There is a presumption that communications between spouses, privately made, are intended to be confidential. However, where it appears from the nature or circumstances under which the communication was made that confidentiality was not intended, the communication is not privileged. *Palumbo*, 5 Ill. 2d at 414. See also *Wolfle v. United States*, 291 U.S. 7, 14 (1934); *Sanders*, 99 Ill. 2d at 267.

¶ 43     Moreover, not all acts are regarded as communications. Implicit in the term "communication" found in section 115-16 is the idea of speech. *People v. Derr*, 316 Ill. App. 3d 272, 278 (2000). See also *People v. Krankel*, 105 Ill. App. 3d 988, 991 (1982). Certain acts, however, may be deemed a communication, such as a nod of the head or wave of the hand. See *People v. Murphy*, 241 Ill. App. 3d 918, 924 (1992); *Krankel*, 105 Ill. App. 3d at 991. In order to fall within the privilege, the nonverbal conduct must clearly be intended as a substitute for, or in lieu of, an oral communication, *i.e.*, it was intended to convey a message. *Simpson*, 39 Ill. App. 3d at 670. See *Derr*, 316 Ill. App. 3d at 278. See also Paul F. Rothstein & Susan W. Crump, Federal Testimonial Privileges § 4:12 (2d ed. 2012) ("the communication should include at least a gesture that is communicative or is intended by one spouse to convey a message to the other"). The mere description by one spouse of general, noncommunicative conduct is not protected by the marital privilege. *Derr*, 316 Ill. App. 3d at 278; *Krankel*, 105 Ill. App. 3d at 991; *Simpson*, 39 Ill. App. 3d at 670.

¶ 44     Thus, two elements must be met before a communication between spouses falls within the privilege. First, the communication must be an utterance or other expression intended to convey a message. Second, the message must be intended by the communicating spouse to be confidential in that it was conveyed in reliance on the confidence of the marital relationship.

¶ 45     The appellate court below, after quoting section 115-16, found that none of the exceptions in the statute were applicable. The appellate court stated, "[a]cts as well as statements are

regarded as communications for the purposes of marital privilege." 2012 IL App (1st) 100259, ¶ 24. The appellate court then concluded that the trial court should have "excluded the evidence of abuse" against Nilsen under the marital privilege. We disagree.

¶ 46       First, it should be noted that defendant's motion to exclude confidential communications sought only to bar the statement he made in April 2004 where he threatened to kill his wife and Kasavich. Defendant also moved, in a separate motion, to exclude his general pattern of violence and abuse toward his wife, the events that occurred in April 2004, and evidence he was jealous that his wife was going to run off with Kasavich and therefore beat her. That second motion, however, was not based on the marital privilege and the appellate court did not address that motion, ruling only that the trial court erred in admitting evidence under the marital privilege.

¶ 47       Further, we find that the events that occurred in April 2004, including defendant's conduct at that time, would not fall within the marital privilege. First, defendant's acts were not nonverbal conduct intended to convey a message. Second, it is commonly recognized that "[a] spouse's testimony as to physical acts of cruelty or abuse by the other spouse is admissible on the ground that no confidential communication is involved, or that the information was not gained as a result of the marital relation." 81 Am. Jur. 2d *Witnesses* §§ 287, 313 (2004). See also 98 C.J.S. *Witnesses* § 305 (2002). See, *e.g.*, *United States v. Koehler*, 790 F.2d 1256 (5th Cir. 1986); *Rich v. Rich*, 887 So. 2d 289 (Ala. Civ. App. 2004); *Morgan v. United States*, 363 A.2d 999 (D.C. 1976); *State v. Parent*, 02-835 (La. App. 5 Cir. 12/30/02); 836 So. 2d 494; *Lenkiewicz v. Kastner*, 227 N.W. 689 (Mich. 1929); *State v. Nettleton*, 760 P.2d 733, 737 (Mont. 1988); *Yowell v. Vaughn*, 85 Mo. App. 206 (1900); *Millspaugh v. Potter*, 71 N.Y.S. 134 (N.Y. App. Div. 1901); *State v. Greaves*, 971 N.E.2d 987 (Ohio Ct. App. 2012); *State v. Govan*, 465 S.E.2d 574 (S.C. Ct. App. 1995); *Adams v. State*, 563 S.W.2d 804 (Tenn. Crim. App. 1978); *Sterling v. State*, 814 S.W.2d 261 (Tex. App. 1991); *State v. Americk*, 256 P.2d 278 (Wash. 1953); *State v. Richards*, 391 S.E. 354 (W. Va. 1990).

¶ 48       We find the above authorities instructive and persuasive. Accordingly, we hold that testimony regarding defendant's conduct in April 2004, *i.e.*, beating her, tying her up, tossing her in his truck, and driving to Kasavich's house, need not have been barred by the marital privilege.

¶ 49       We now consider whether defendant's threat to kill Nilsen and Kasavich must be barred by that privilege. The appellate court concluded that defendant's threat was a private communication between defendant and Nilsen, and that no exception to section 115-16 applied. Thus, the appellate court held that the trial court should have barred defendant's threat under the marital privilege. We disagree and conclude that defendant's threat was not barred by the privilege because it was not a confidential communication.

¶ 50       No court in Illinois has yet defined what "confidential" encompasses. However, other jurisdictions have and not every conversation between husband and wife made in private is deemed confidential. The privilege "covers only those private exchanges which 'would not have been made but for the absolute confidence in, and induced by, the marital relationship' " and " 'prompted by the affection, confidence and loyalty engendered by such relationship.' " *People v. D'Amato*, 430 N.Y.S.2d 521, 522-23 (N.Y. Sup. Ct. 1980). See also *Nettleton*, 760

P.2d at 738; 81 Am. Jur. 2d *Witnesses* § 297 (2004); Paul F. Rothstein & Susan W. Crump, Federal Testimonial Privileges § 4:12 (2d ed. 2012); George L. Blum, *"Communications" Within Testimonial Privilege of Confidential Communications Between Husband and Wife as Including Knowledge Derived From Observation by One Spouse of Acts of Other Spouse*, 23 A.L.R.6th 1 (2007). As another court has stated, " '[o]nly those communications passing from one marriage partner to the other because of the confidence resulting from their intimate marriage relationship receive such protection.' " *Rubalcada v. State*, 731 N.E.2d 1015, 1022 (Ind. 2000) (quoting *Rode v. State*, 524 N.E.2d 797, 799 (Ind. Ct. App. 1988)). Conversely, " 'if what is said or done by either has no relation to their mutual trust and confidence as husband and wife, then the reason for secrecy ceases.' [Citation.]" *Rubalcada*, 731 N.E.2d at 1022 (defendant's threats to kill wife and whatever she loved most if she disclosed facts about murder he committed not barred by spousal privilege because "[s]uch communications do not enhance the mutual trust and confidence of the marital relationship that the privilege is intended to protect"). See also *Beyerline v. State*, 45 N.E. 772 (Ind. 1897) (not every conversation between husband and wife, nor every word or act said or done protected under "seal of secrecy"; only those communications passed from one to another by virtue of the confidence resulting from their intimate relationship are protected; if what is said or done has no relation to mutual trust and confidence as husband and wife, then the reason for secrecy ceases); *State v. Edwards*, 260 P.3d 396 (Mont. 2011) (a spouse does not rely on the confidence of the marital relationship when the purpose of the communication is to "terrify and intimidate" the other spouse; wife's testimony that defendant "pulled a shotgun and put it in [her] face and told [her] if [she] ever went to the cops, or ever told anyone, that he would kill [her], kill [her] family, and burn [her] grandmother's house down" admissible in prosecution of defendant for murder because communication not made in reliance on confidences of marital relationship); *State v. Applegate*, 668 S.W.2d 624, 635 (Mo. Ct. App. 1984) (husband's threats to do violence to former wife not confidential communications within marital privilege statute); *People v. Mills*, 804 N.E.2d 392, 396 (N.Y. 2003) (defendant's admission to killing in past and threat to kill his wife admissible in trial for past murder because "[c]ommunications or threats made during the course of physical abuse are not entitled to be cloaked in the privilege because the maker of the statement is not 'relying upon any confidential relationship to preserve the secrecy of his acts and words' "); *People v. McCormack*, 104 N.Y.S.2d 139, 141 (N.Y. App. Div. 1951) (testimony that, while brandishing bayonet, husband threatened wife with "I am going to kill. I am going to kill everybody. I'm going to kill any *** person I see" admissible in prosecution for murder of man in street shortly thereafter where method and nature of communications strongly militated against view that it was confidential; testimony of spouse as to words uttered or acts committed while in course of a personal assault or injury by other not deemed within spousal privilege especially where defendant knew wife might reveal his utterances and actions if she had him arrested and prosecuted for his attack on her), *aff'd*, 103 N.E.2d 895 (N.Y. 1952); *Commonwealth v. Spetzer*, 813 A.2d 707, 720 (Pa. 2002) (defendant's statements to wife admitting he raped her minor daughter, details of plans to abduct the daughter and her sister and to rape them, and intimidation of wife and daughter to recant their accusations admissible against defendant in trial for rape of daughter because

communications were not confidential since not "sensitive, marital harmony-inspiring communications contemplated by" spousal privilege).

¶ 51   Whether a particular communication is privileged as having been made in reliance upon the marital confidence depends on the nature and form of the communication and the circumstances immediately surrounding its making. Such a determination is a preliminary question of fact to be decided by the trial court. *D'Amato*, 430 N.Y.S.2d at 522-23.

¶ 52   Here, defendant's threat to kill Nilsen and Kasavich was certainly not made in reliance on the confidences of his marriage. It is evident that defendant intended Nilsen to reveal the threat to Kasavich. Also, it is the type of communication that Nilsen might have revealed to one of her family members, or even the police. See, *e.g.*, *Newell v. State*, 49 So. 3d 66 (Miss. 2010) (defendant's message left on wife's cell phone in which he threatened to shoot her and her alleged lover not confidential for purpose of spousal privilege since wife would have communicated to lover or police). It is also evident, from the circumstances surrounding defendant's threat, that it was not motivated by his reliance on the intimate, special trust, and affection of his marital relationship. The threat had no correlation to the mutual trust between defendant and Nilsen as husband and wife. Accordingly, we conclude that defendant's threat made in April 2004 to kill Nilsen and Kasavich was not confidential and, therefore, was not protected by the marital privilege.

¶ 53   For the foregoing reasons, we reverse the judgment of the appellate court and remand this cause to that court so it may address the other issues raised by defendant which were not previously considered.

¶ 54   Reversed and remanded.

¶ 55   JUSTICE THEIS, specially concurring:

¶ 56   The sole issue before this court is whether the marital communication privilege, as codified in section 115-16 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-16 (West 2010)), applies to an April 2004 communication between defendant and his wife, Laura Nilsen, in which defendant threatened to kill Nilsen and the victim, Donald Kasavich. I join the majority opinion in holding that this threat, made two months before the victim was found dead, was not barred by the marital communication privilege because I agree that it did not constitute confidential communication.

¶ 57   My primary disagreement with the majority opinion is its analysis of what constitutes confidential marital communication. I am troubled by the majority's reliance upon case law from foreign jurisdictions to carve out a new exception to Illinois' marital privilege which is not found in our own statutory language and requires our trial courts to consider the health or status of a marital relationship at the time a communication occurred in order to determine whether it entails a confidential communication.

¶ 58   As in all cases of statutory interpretation, this court's primary objective should be to ascertain and give effect to the legislature's intent, keeping in mind that the best and most reliable indicator of that intent is the statutory language itself, given its plain and ordinary

meaning. *People v. Gutman*, 2011 IL 110338, ¶ 12. In construing a statute in this way, we may not read into the statute exceptions, limitations, or conditions for which the legislature did not provide. *People v. Dominguez*, 2012 IL 111336, ¶ 16. Generally, a trial court's ruling on evidentiary matters will not be reversed absent a clear abuse of discretion. *People v. Hall*, 195 Ill. 2d 1, 20 (2000). Where, as in this case, the question concerns purely statutory interpretation, a question of law, we apply *de novo* review. *Id.* at 21.

¶ 59    Illinois' marital communication privilege, contained in section 115-16 of the Code, provides, in relevant part:

"Witness disqualification. \*\*\*

In criminal cases, husband and wife may testify for or against each other. Neither, however, may testify as to any communication or admission made by either of them to the other or as to any conversation between them during marriage, except in cases in which either is charged with an offense against the person or property of the other, in case of spouse abandonment, when the interests of their child or children or of any child or children in either spouse's care, custody, or control are directly involved, when either is charged with or under investigation for [listing certain sex offenses] and the victim is a minor under 18 years of age in either spouse's care, custody, or control at the time of the offense, or as to matters in which either has acted as agent of the other." 725 ILCS 5/115-16 (West 2010).

¶ 60    Consequently, under the plain language of the statute, the marital privilege in Illinois prohibits testimony as to any communication or admission by either spouse to the other or as to any conversation between them during the marriage unless one of the five specified exceptions apply. None of the exceptions apply to the communication of the threat made by defendant to Nilsen.

¶ 61    This court has long held, however, that the statutory marital privilege applies only when the communication from one spouse to another was intended to be of a confidential nature. See, *e.g.*, *People v. Palumbo*, 5 Ill. 2d 409, 415 (1955). While the majority recognizes this point, it holds that "[n]o court in Illinois has yet defined what 'confidential' encompasses." *Supra* ¶ 50. I disagree. This court's own precedent has instructed on what confidential marital communication entails and should control our outcome today.

¶ 62    Our decision in *Palumbo* is the starting point for our interpretation of the statute relating to the admissibility of interspousal communication as applying solely to confidential communication. In *Palumbo*, we recognized that there is no specific language in the statute that the marital communication must be confidential in order for the privilege to apply. *Palumbo*, 5 Ill. 2d at 415. We looked at the historical background of the statute and noted that under an earlier provision, the statute provided that a husband or wife may not testify to any admissions or conversations of the other, whether made by him to her or her to him, or by either to third persons. *Id.* After the statute was amended, the reference to third persons was omitted. *Id.* We interpreted the legislature's intent in removing the statutory language referencing third persons as conforming to the common law privilege which had only covered confidential communication. *Id.* Following the examination of the statutory framework in *Palumbo*, we concluded that the conversation at issue was ineligible for protection under our

marital privilege because it was not confidential as it took place in the presence of a third person who, according to the wife, was trying to purchase narcotics from the defendant who was her husband. *Id.* at 411, 415.

¶ 63 Thereafter, in *Sanders*, relying upon the framework this court established in *Palumbo*, we held that while there is a presumption that interspousal communications are intended to be confidential if, under the circumstances in which the communication took place, it appears that confidentiality was not intended, the communication is not to be regarded as privileged. *People v. Sanders*, 99 Ill. 2d 262, 267 (1983). We reiterated that communications made in the presence of third persons are not regarded as privileged because they are not made in confidence. *Id.* We therefore found the conversation ineligible for protection under the statutory marital privilege because the presence of the couple's 13-year-old son destroyed the confidential nature of the spousal communication during which the husband told his wife that he robbed the victim. *Id.* at 266, 269.

¶ 64 In the instant case, Nilsen testified the threat that defendant would kill her and the victim was made at the victim's trailer, and the only reason defendant did not communicate directly with him that night was that his repeated knocks on the victim's trailer door went unanswered. As the majority holds, it is evident from the circumstances that defendant made the threat with the intention of a third party, the victim, being made aware of it, presumably to discourage any further contact between Nilsen and Kasavich. *Supra* ¶ 52. Consequently, wholly consistent with our holdings in *Palumbo* and *Sanders,* the communication is not privileged because based upon the circumstances in which the threat was made by defendant, confidentiality was obviously not intended. Nothing more needs to be said in answering the sole issue before us.

¶ 65 The majority's error in holding that no court in Illinois has instructed on what confidential marital communication encompasses results in its analysis becoming unhinged from our statute and creating a new exception to our marital privilege. Relying exclusively on case law from outside this state, the majority today holds that "[t]he privilege 'covers only those private exchanges which "would not have been made but for the absolute confidence in, and induced by, the marital relationship" ' and ' "prompted by the affection, confidence and loyalty engendered by such relationship." ' " *Supra* ¶ 50 (quoting *People v. D'Amato*, 430 N.Y.S.2d 521, 522-23 (N.Y. Sup. Ct. 1980)).

¶ 66 I recognize the majority's apparent desire in not wanting to extend the evidentiary privilege to marital relationships that at the time of a communication have seemingly broken down. Basing a holding on a desire for a particular outcome, however, would do considerable violence to our rules of statutory construction and decisionmaking principles. The majority opinion ignores the most basic tenet of statutory construction that we do not enlarge the meaning of a statute by reading into it language not contained therein. *People v. Woodard*, 175 Ill. 2d 435, 443 (1997). Our legislature has provided five specific exceptions to the application of the marital privilege in Illinois. It is not the role of this court to add a sixth.

¶ 67 Today's holding also leaves trial courts in Illinois in the untenable position of having to assess, without any real objective criteria from this court, the health and status of a marriage at the time a communication occurred, in order to determine, as the majority articulates, whether the communication was "motivated by [the spouse's] reliance on the intimate, special trust,

- 14 -

and affection of [the] marital relationship." *Supra* ¶ 52. To complicate matters further for our trial courts, the majority in discussing what constitutes confidential communication provides, without any synthesis, no fewer than seven different parentheticals from various states, one going back to the nineteenth century, as to the criteria considered by those courts when making the determination. See *supra* ¶ 50. Consequently, it is entirely unclear what standard our trial courts should now apply when making a judicial determination of marital harmony as required by today's opinion.

¶ 68   My secondary disagreement with the majority opinion is its analysis of the admission of evidence regarding defendant's conduct in April 2004, and whether it is subject to the marital privilege. The majority opinion again unnecessarily relies exclusively on authority from outside this state (see *supra* ¶¶ 47-48) when the question should be answered based upon the language of our own statute. Simply put, the marital privilege would not apply to defendant's acts (*i.e.*, that he beat Nilsen, tied her up, forcibly placed her in his truck, and drove to Kasavich's house in April 2004) because under the plain language of our statute the privilege applies only to communications and admissions made by either spouse to the other, and to conversations between spouses during marriage, and would never include defendant's *conduct* here. See *People v. Hall*, 194 Ill. 2d 305, 335 (2000) (wife's testimony in describing her own conduct in purchasing guns for the defendant and sending them to him was not subject to the marital privilege because the privilege does not apply to such conduct).

¶ 69   Additionally, as the majority recognizes, defendant's motion to exclude confidential communication under the marital privilege sought only to bar the statement he made where he threatened to kill Nilsen and Kasavich. See *supra* ¶ 46. The majority acknowledges that defendant moved in a separate motion *in limine* to exclude, in pertinent part, the conduct that occurred in April 2004. *Supra* ¶ 46. This separate motion did not seek exclusion of this evidence based on the marital privilege but, rather, because such evidence constituted improper evidence of other crimes, wrongs, or acts (see *People v. Kliner*, 185 Ill. 2d 81, 146 (1998); see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)), which is one of the issues that this court has now remanded to the appellate court to address (see *supra* ¶ 57).

¶ 70   I find no need to analyze whether it would be proper to exclude the evidence of defendant's conduct under the marital privilege when that was not the basis put forth by defendant in his motion *in limine* for barring it. Defendant specifically challenged the admission of this evidence of other crimes, wrongs, or acts on appeal and it would be best left, in my estimation, to the appellate court to consider the issue as directed.

¶ 71   Accordingly, I cannot join the reasoning of the majority opinion.

¶ 72   JUSTICE KARMEIER joins in this special concurrence.

- 15 -

¶ 73    JUSTICE THEIS, dissenting:

¶ 74    In his petition for rehearing, defendant appropriately takes issue with the majority carving out a new exception to Illinois' marital privilege that is not contained in our statutory language but, rather, is based exclusively on judicial opinions from other states. The majority not only disregards the language of our statute, but also fails to acknowledge the significant body of case law from other jurisdictions that finds a judicial determination of the health or worthiness of a marriage entirely irrelevant in determining whether the evidentiary privilege applies. See, *e.g.*, *People v. Starr*, 622 N.Y.S.2d 1010, 1012 (N.Y. App. Div. 1995) ("It has long been held that it is not appropriate for a trial court [for purposes of applying the marital privilege] to have to determine whether a marital relationship is genuine or viable \*\*\*."); *Jackson v. State*, 603 So. 2d 670, 671 (Fla. Dist. Ct. App. 1992) (*per curiam*) ("The courts will not engage in an after-the-fact analysis of whether a statement is 'incidental to' or 'because of' the marital relationship, because a married couple, and each of them, should be secure in the knowledge that their private communications are exactly that—private."); *United States v. Sims*, 755 F.2d 1239, 1243 n.3 (6th Cir. 1985) ("We do not believe that courts can or should assess the social worthiness of particular marriages or the need of particular marriages for the protection of the privilege." (Internal quotation marks omitted.)); *United States v. Byrd*, 750 F.2d 585, 592 (7th Cir. 1984) ("[W]e reject the government's argument that where the communications are made in a 'deteriorated marriage,' the communications privilege cannot apply. \*\*\* [T]he making of the determinations of when a marriage has deteriorated to the point when its communications are no longer confidential would involve courts in difficult factual inquiries in which we are reluctant to require trial courts to become involved."); *In re Grand Jury Empanelled October 18, 1979*, 633 F.2d 276, 279 (3d Cir. 1980) ("[W]e are not confident that courts can assess the social worthiness of particular marriages or the need of particular marriages for the protection of the privilege."); *United States v. Lilley*, 581 F.2d 182, 189 (8th Cir. 1978) ("We refuse to condition the privilege, as the government would have us do, on a judicial determination that the marriage is a happy or successful one.").

¶ 75    I find it particularly curious that the majority relies upon two decisions of the Indiana Supreme Court (see *supra* ¶ 50), one from 1897, while completely ignoring that court's most recent pronouncement from 2005:

>    "If the General Assembly chooses to engraft a qualification onto the marital privilege based on the quality of the marriage it is of course free to do that. But we are reluctant to require courts to inquire into the quality of a marriage beyond examining whether the marriage was for purposes of disqualifying a witness." *Glover v. State*, 836 N.E.2d 414, 419 (Ind. 2005) (citing *Lilley*, 581 F.2d at 189, *People v. Fields*, 328 N.Y.S.2d 542, 544-45 (N.Y. App. Div. 1972), and *State v. Freeman*, 276 S.E.2d 450, 455 n.2 (N.C. 1981)).

I believe this court would be wise to follow the same disciplined reasoning applied by the court in *Glover* and acknowledge that our governing statute does not contain the exception desired by the majority here.

¶ 76    The majority's analysis is misleading and, at best, incomplete. For this reason, and for the reasons already set forth in my special concurrence, I would grant defendant's petition for rehearing.

¶ 77    JUSTICES KILBRIDE and KARMEIER join in this dissent upon denial of rehearing.