The People of the State of Illinois, Plaintiff-Appellee,
v. Norman Hill, Defendant-Appellant.

Gen. No. 50,109.

First District, Second Division.

June 8, 1965.

Sherwin & Sherwin, of Chicago (Julius L. Sherwin, Theodore R. Sherwin, and Sheldon R. Nissen, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Matthew J. Moran, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE BRYANT delivered the opinion of the court:

This is an appeal from a judgment entered May 1, 1959, on a jury verdict finding the appellant, Norman Hill, guilty of forcible rape. The appellant asks that his conviction be reversed outright, or in the alternative, that the conviction be reversed and the cause remanded for a new trial, on the grounds that evidence was improperly admitted, that both the prosecuting attorney and the trial judge acted improperly during the course of the trial, and because his guilt was not shown beyond a reasonable doubt.

During the evening of January 31, 1959, the complaining witness, Sharon Eddington, age 19, was a baby sitter for a family in Winnetka, Illinois. A friend of hers, Karon Martin, also 19 years old, was acting as baby sitter for another family in the same community. Sharon's employers returned home about one o'clock on the morning of February 1, 1959, and she then drove her father's car to the house where Karon was staying. When the family for whom Karon was sitting returned home, the two girls drove Sharon's father's car to a restaurant for a snack. When they started for home, after having eaten, they discovered that the automobile they were driving was nearly out of gas and, therefore, stopped at a service station in the vicinity. The girls testified that while they were at the gas station they noticed two men in another car watching them. The gas station attendant who waited on the girls that night testified that he recognized the car. He stated that he had serviced that car several times before and that it belonged to the appellant, but said he did not pay any attention to who

242

was in it that night. The attendant explained that the car he recognized as the appellant's did not stop at the station that night, but only drove through slowly. He said that since he was busy waiting on customers, he did not bother to look to see who was in that car. The girls confirmed the attendant's testimony that the car in which the two men were in did not stop at the gas station, but only drove through.

The two girls testified that the car in which the men were left the gas station before they did. They said they drove north on Green Bay Road while the other automobile went south. As they were driving home, however, they noticed that the car they had observed in the gas station had reversed its course and was following them. The girls drove toward Sharon's home which was on the grounds of the Indian Hill Country Club, her father being employed as the Club steward. The men forced the girls' car off the road and into a snow bank just inside the entrance to the country club.

Karon Martin testified that the car which was following them was blue and white and was either a hardtop or a convertible. She looked at a photograph of the appellant's automobile and stated that it looked like the car the assailants were driving.

Sharon Eddington said during her testimony that there were two metal Vs on the grill of the automobile the two men were in, and that the ends of the two Vs touched each other so as to form a W-like design. When describing the car of their assailants to a policewoman, Sharon stated that the car had two spotlights, one on each side. She also described the car as a Chevrolet hardtop.

A garage mechanic, Harold Koehler, testified that he repaired the starter switch on the appellant's car on or about January 24, 1959, a week before the alleged rape. He described the appellant's automobile

243

as a 1956 Chevrolet convertible. He said the car had two rear view mirrors, one on each side, and that the grill had been altered so that it had only five or six vertical bars with two Vs on them. He stated that the top of the convertible was unusual in that the rear window was enlarged so that it had the lines of a hardtop. He said that from a distance, one might not be able to distinguish this car from a hardtop. Koehler said the Vs on the grill of this car did not form a W, that they were too far apart for that.

Sharon Eddington, the complaining witness, testified that when they were stopped, she locked the doors of the car and turned on the interior light. The appellant then got out of his car and walked to the driver's side of the girls' automobile, according to this witness. Sharon said he forced his arm through the no-draft, or small vent window on her side of the car and opened the door from the inside. He then reached over and opened the door on the opposite side of the car to let in his companion. Sharon said that the defendant's face was but a few inches from hers at this time, and stated that she definitely recognized the appellant as the man who assaulted her.

Karon Martin also testified that the interior light of their car was on, and she too made a positive identification of the appellant as being the man who assaulted Sharon.

The testimony was uncontroverted that it was a cloudy, dark night and that there were no street lights in the vicinity of the place where the girls were assaulted. The girls testified, however, that the headlights of the car of their attackers were on during the assault and that this plus the interior lights of their car furnished enough illumination for them to identify the men. The evidence shows Sharon Eddington was raped. Karon Martin was assaulted, but managed to repulse her attacker.

244

After the men had gone, the girls went immediately to Sharon's house and told her father she had been raped. Sharon's brother telephoned the police and the girl was taken to the hospital for treatment. A doctor at the hospital testified that he examined Sharon on February 1, 1959, and that her face was bruised, her jaw swollen and her left eye black and blue. He testified that in his opinion the girl had been entered vaginally.

On February 3, the police told the girls they were bringing two men to the hospital for them to identify. The girls testified they went into a room where two men were standing, but could not identify them because the men were standing in front of a window and the sun was shining in the girls' eyes. The girls left the room and asked the police if the blinds could be closed, which request was granted. The girls then re-entered the room and identified the men as their assailants.

A severance was granted for the trial of the two men since the man arrested with the appellant, one Joe Louis Dumas, apparently made statements which would not be admissible against the appellant.

As his first point the appellant urges that it was error for the Court below to admit over objection the opinion of a physician that the prosecuting witness had been recently entered vaginally. There are several cases cited in support of the appellant's proposition; none of them are controlling in the case before us. In two of the cases, People v. Schultz, 260 Ill 35, 102 NE 1045 (1913) and People v. Kwilosz, 368 Ill 461, 14 NE2d 475 (1938), it was held to be error for a court to admit testimony from a doctor that the complaining witness had been raped.

The Supreme Court explained its stand in the Schultz case, supra, in its opinion, People v. Ardelean, 368 Ill 274, 278–9, 13 NE2d 976, 979 (1938). There the

Court said, "In the Schultz case we held that it was improper to permit a doctor to state that, 'according to the history of the case and according to my findings I think it was a case of rape.' The statement in the Schultz case is much different from the one challenged here. To constitute rape, certain facts must be established prior to conviction—e. g. requisite age, force, resistance, and the like. Thus, an opinion that injuries to a prosecutrix were the result of rape, must necessarily be based upon factors of which a medical expert is no more qualified to judge than the jurors themselves."

The Court said in its opinion in the Ardelean case, supra, that a doctor could give testimony "based solely upon his physical examination of the prosecutrix," and permitted testimony from a doctor that the condition he observed could have been caused "by the insertion of a male sexual organ."

In the case at bar, the doctor testified first to the physical condition of the complaining witness when he examined her on February 1, 1959, and then in response to a question stated that he was of the opinion that she had recently been entered in the vagina. This testimony is not improper. The doctor is testifying only as to what he personally observed—the physical condition of the complaining witness. He made no conclusions as to whether the condition was caused by rape or not. The Schultz case, supra, and the Kwilosz case, supra, are, therefore, easily distinguishable from the case at bar.

The appellant also cites the case of People v. Anderson, 406 Ill 585, 94 NE2d 429 (1950) for the proposition that the doctor's testimony was inadmissible. In that case, a prosecution for incest and rape, there was great doubt whether any violation of the prosecuting witness had actually occurred. The doctor who testified had examined the girl 21 days after the alleged

offense was committed, and he testified that he thought the girl was not a virgin. He stated, however, that the condition he observed could have been caused by any number of things. The Supreme Court held that since the condition could have been caused by many things, it was improper for the doctor to express an opinion as to what actually caused the condition described.

In the case at bar, the doctor examined the complaining witness hours after she was attacked. He could state with a reasonable degree of certainty that she had been recently entered in the vagina. Unlike the doctor in the Anderson case, supra, he was not making a guess from several choices as to what caused the condition he observed. We hold, therefore, that it was not error for the Court below to admit this testimony.

The second point raised by the appellant is that it was reversible error for the court to admit over objection hearsay evidence of Karon Martin, concerning statements made by the prosecuting witness to her father out of the presence and hearing of the appellant. The claim is also made that it was reversible error for the Court below to admit hearsay evidence of the statements of the father of the prosecuting witness, out of the presence and hearing of the appellant.

The appellant cites 11 cases to the effect that hearsay evidence is not admissible. While these cases set forth the general rule concerning the admissibility of this type of evidence, they do not control the case at bar, for the statements made by the prosecuting witness fall under the well recognized "spontaneous declaration" exception to the hearsay rule. The Supreme Court said in People v. Poland, 22 Ill2d 175, 181, 174 NE2d 804 (1961), that three factors must be present for a statement to be admissible under the spontaneous declaration exception to the hearsay rule: (1) an occurrence sufficiently startling to produce a

spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence.

In People v. Damen, 28 Ill2d 464, 473, 193 NE2d 25, 30 (1963), the Supreme Court pointed out that while a complaint of rape must be promptly made by the victim, complaints made some two months after the occurrence had been admitted where the delay was satisfactorily explained. People v. Mason, 301 Ill 370, 133 NE 767 (1922). In the case at bar, Sharon Eddington made an immediate complaint to Karon Martin that she had been raped. This complaint was made moments after the two men had left the girls in their car. The girls then went immediately to Sharon's father to whom the complaint was made again. The circumstances were sufficiently shocking to produce a spontaneous declaration, the statement to the father was within a short enough period to come under the rule, and the complaint pertained to the circumstances of the occurrence. Sharon's statement to her father that she had been raped was, therefore, admissible as a spontaneous declaration.

Mr. Eddington's statement is not admissible as a spontaneous declaration. His statement, "Oh, my God. . . . Duke, Duke, Sharon has been raped. Call the cops," was a spontaneous reaction to his daughter's complaint, but there is a caveat to the spontaneous declaration exception of the hearsay rule that the declarant must have had an opportunity to observe personally the matter of which he speaks.

In People v. Poland, supra, the Supreme Court held that it is sufficient if it appears inferentially that the declarant personally observed that to which his statement relates and that there is nothing to make a contrary inference more probable. In the case at bar it is completely clear from the record that Mr. Eddington did *not* see his daughter being raped. His statement that she was raped is, therefore, inadmissible.

248

People v. Poland, supra; Wigmore on Evidence, 3rd Edition, Vol VI, § 1751.

■ ■ We hold, however, that the error was not prejudicial and does not require reversal. "Error in the admission of evidence is harmless where the facts involved are established by other competent evidence . . ." People v. Pelkola, 19 Ill2d 156, 162, 166 NE2d 54, 58 (1960). The father's statement was merely cumulative and its improper admission does not require reversal since the fact that Sharon had been raped was amply established by other evidence.

■ The appellant's next claim is that it was prejudicial error for the prosecutor to ask the arresting officer, "Now before going to the home of this defendant, Hill, did you have a conversation with one Joe Louis Dumas?" It is acknowledged in the appellant's brief that, "Prior to the trial the defendant filed his verified petition in support of his motion for a severance, alleging in part that the codefendant, Joe Louis Dumas had made a statement incriminating the defendant Hill, which motion was allowed by the court and a severance granted." It is the appellant's claim that "the question asked by the prosecutor *was for the sole and deliberate* purpose of injecting into the case and bringing to the knowledge of the jury the fact that Joe Louis Dumas, the codefendant, had confessed his participation in the crime charged and had implicated the defendant Hill in said crime."

After reading the record, we must agree with the appellant to the extent that there did not seem to be any proper purpose for asking the arresting officer with whom he had spoken before arresting the appellant, but we do not think the appellant has shown us that this question resulted in prejudice to him. As was said in the People's brief, "The details of the conversation were not revealed nor was there any indication that Dumas implicated Hill. The defendant's claim in that regard is based entirely on specula-

tion." The jury was aware that the appellant was arrested with Joe Louis Dumas and should not have found it unusual that the police had talked to both the men charged with this crime. We find no basis for believing the jury concluded that Dumas made any statement implicating Hill in the crime, and we will not assume that there was prejudicial error. People v. Williams, 383 Ill 348, 50 NE2d 450 (1943).

■■ The appellant next claims he was prejudiced by the "calculated, deliberate and repeated misconduct of the prosecutors to improperly create the impression that the automobile used by the assailant of the prosecuting witness was that of the defendant." This claim is based first on the fact that Karon Martin was allowed to state that a photograph of the appellant's automobile "looked like" the car driven by Miss Eddington's assailant. We find nothing objectionable in such a question or answer. Normally, a witness would not be able to say that a photograph of an automobile *was* the car in question. A statement that a photograph looks like the car has probative value and is admissible. The jury as trier of fact is perfectly capable of weighing such evidence and assigning to it an importance concomitant with its probative value. There was certainly no error in this question.

■ The appellant objects to the prosecution's referring to the car as a convertible when some of the witnesses said it looked like a hardtop. It is urged that the prosecutor was trying to guide the witnesses into saying things they did not mean. Yet it is clear that the appellant's car was a convertible, and the impression of some of the witnesses that it was a hardtop was fully explained by the fact that it had an extra large rear window—much larger than the ordinary convertible window—and by the undisputed testimony that the car driven by the assailants that night had snow on the roof, thus making it difficult to determine that the car was in fact a convertible

250

without close scrutiny. The gas station attendant positively identified the car which drove by as the girls were getting gas as being the appellant's. The garage mechanic, Harold Koehler, also made a positive and firm identification of the appellant's car as being a convertible, but with an enlarged rear window. He stated that because of the extra large rear window, the car had the lines of a hardtop. He also identified the car as having two Vs on the grill and two rear view mirrors. Since the evidence was overwhelming that the car in question was the appellant's car and that the car was a convertible, it was not error for the prosecutor to refer to it as such.

The fact that the girls could not give the correct license number of the car driven by their assailants does not weaken their identification of the appellant's car. As noted before, the car had a most unusual grill and was easily recognizable because of this. The fact that the witnesses could not agree whether the Vs came together to form a W or not is a very minor point when compared to the strong evidence connecting the assailants' car to the appellant.

The appellant also stresses that Sharon said she thought their assailants' car had two spotlights when the appellant's car had but one is of little force and can easily be explained by pointing out that the appellant's car had two rearview mirrors. It would be quite easy for the girls to be confused about this on a dark night and while in fear of bodily assault, and it does not appreciably weaken the People's case.

Sharon also said that the car might have had shades over the top portion of the headlights. When the police found the appellant's car, it had no such shades. We point out, however, that the appellant had more than enough time to remove any shading on his headlights. It is also true that when the car was found by the police there were no Vs on the grill, but there

was unrefuted evidence that the appellant's car had two Vs on the grill a week before the rape took place. The appellant would have an obvious motive for removing these distinctive features from his automobile. The jury was aware of the condition of the appellant's car when found by the police a short distance from his home. They were perfectly capable of determining the weight to be given the testimony of the witnesses. There is certainly no basis for reversing their decision as being against the weight of this evidence.

The appellant points out that he had an alibi for the time the crime took place. His wife and mother testified that he was home the night in question. They also both testified that they went to sleep before the crime took place. It was for the jury to weigh the conflicting evidence and determine the credibility of the witnesses. In view of the fact that the girls identified the appellant as the man who raped Sharon, and in view of the strong identification of the appellant's car, we cannot say that the verdict of the jury was against the weight of the evidence, nor can we say that we entertain any reasonable doubt as to the appellant's guilt.

There was also some confusion as to whether Sharon's attacker was identified as wearing a dark sport jacket or a dark suit. In view of all the evidence it makes little difference which of the two descriptions was used. The point is a minor one and the People's case can hardly be said to be any weaker because of some confusion as to whether the assailant was wearing a suit or a jacket. There was also some confusion as to whether Karon Martin picked out the appellant's picture from a police file as being the man who attacked Sharon or the man who attacked her. Apparently the report of the policewoman who was with Karon at the time originally stated that the ap-

pellant was identified as being the attacker of Karon, not of Sharon. The policewoman said, however, that at the time the identification was made, the appellant was identified as being Sharon's attacker. The police-woman said she wrote down that the appellant was Karon's attacker by mistake, meaning to write down that he was Sharon's attacker.

 The appellant's final objection goes to the conduct of the Court below during the trial. At one point the Court below repeated a question asked of Karon Martin on direct examination after having overruled an objection to it. This conduct can hardly be said to constitute error. Here, the Court below did not even ask a question of his own, but merely repeated a question asked of the witness by an attorney. There is no basis at all for holding this error.

 The other point of complaint is that the Court below unduly restricted cross-examination of the complaining witness. It is claimed that this restriction prevented the appellant's attorney from establishing that no penetration had occurred. Yet the Court below did not prevent the appellant's attorney from inquiring as to whether penetration had occurred. The questioning he stopped was, "Was the emission within you or—" Where the emission occurred is of no consequence as proof of an emission is not an essential element of the crime of rape. Ill Rev Stats (1963), ch 38, § 11–1(b).

 Another supposed instance of improper conduct by the Court occurred when he recalled the police-woman on his own motion to testify on the question of whether the appellant had originally been identified as the attacker of Sharon or Karon. The witness was examined by the Court and testified that she erased the original of the statement to read that the appellant was Sharon's attacker. The statement had originally read that he was Karon's attacker. She

said that the erasure was made the day she typed the statement—February 2, 1959. She had testified that the appellant was picked out as the attacker of Sharon. As the previous examination of this witness was confusing, the Court below was in his rights to call the witness back so that the jury might fully understand what had transpired.

In view of the fact that the appellant was identified by the girls as Sharon's attacker, and in view of the identification of the appellant's automobile as the one used in the crime, we hold that the jury's verdict was not against the manifest weight of the evidence. We also hold that there was no reversible error during the course of the trial. The judgment is, therefore, affirmed.

Judgment affirmed.

BURKE, P. J. and LYONS, J., concur.