# Illinois Official Reports

## Appellate Court

---

### *People v. Garner*, 2016 IL App (1st) 141583

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICE GARNER, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-14-1583 |
| Filed<br>Modified upon<br>denial of rehearing | August 5, 2016<br><br>September 23, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-8607; the Hon. Brian Flaherty, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Michael Gentithes, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Peter Fischer, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE DELORT delivered the judgment of the court, with opinion.<br>Presiding Justice Rochford and Justice Hoffman concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant Patrice Garner was convicted of murdering her six-year-old daughter, Kierra Garner, and sentenced to 35 years' imprisonment. In this appeal, defendant argues that she is entitled to a new trial because the trial court improperly (1) excluded expert testimony regarding her psychological make-up, (2) permitted testimony regarding communications between her husband and her in contravention of the Illinois spousal privilege statute, and (3) permitted another witness to testify about statements made by her mother that incriminated her. We affirm.

¶ 2                                    BACKGROUND

¶ 3    In April 2006, defendant was charged by indictment with four counts of first degree murder stemming from the death of her daughter, Kierra Garner. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2006). The gist of the indictments was that defendant knowingly and intentionally caused Kierra to ingest an antidepressant that resulted in her death. The State's theory of the case was that defendant tried to kill herself and Kierra after defendant's husband told her that he wanted a divorce. Under the State's theory, defendant carried out her plan by administering an overdose of amitriptyline, an antidepressant she had been prescribed for migraine headaches, to Kierra and herself.

¶ 4    Before trial, defendant hired Dr. Bruce Frumkin, a clinical psychologist, to evaluate her sanity. Dr. Frumkin interviewed defendant and, in April 2009, authored a three-page report memorializing his findings. The report is not contained in the record, but defense counsel summarized Dr. Frumkin's report for the trial court during an April 20, 2009, hearing:

> "THE COURT: What's the basis of his opinion? What's the opinion saying? Just briefly.
>
> [DEFENSE COUNSEL]: Just briefly, Judge, two things. One, he's saying that he concluded that the defendant was not feigning amnesia when she couldn't remember; and, two, that her personality traits were not such that it would—a potential break up with her husband would cause her to commit suicide and also take the life of her daughter."

¶ 5    On March 23, 2010, the State filed a motion *in limine* seeking to preclude defendant from introducing Dr. Frumkin's opinion testimony on the basis that it constituted inadmissible character evidence. The State argued in the alternative that the court should conduct a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), to determine whether "Dr. Frumkin's theory that a person could not have committed a murder because murder is not within her personality, is a generally accepted theory in the psychological community."

¶ 6    On March 24, 2010, the court held a hearing on the State's motion. The court noted that Dr. Frumkin's report did not contain any "opinion as to what Dr. Fromkin [*sic*] is going to testify to" and advised the parties that it needed a written statement from Dr. Frumkin before it could rule on the State's motion. Thus, on March 29, 2010, Dr. Frumkin authored a one-page letter summarizing the findings contained in his April 2009 report. A copy of the March 2010 letter was tendered to the trial court. In the letter, Dr. Frumkin stated:

> "I understand the court desires some clarification of my opinion expressed in my April 9, 2009 three-page letter to you. It is my opinion with a high degree of

psychological certainty that Ms. Garner was not attempting to exaggerate or feign memory impairment or amnesia regarding events immediately leading up to her hospitalization and subsequent arrest. \*\*\*

In addition, it is my opinion with a high degree of psychological certainty that Ms. Garner was not a needy or dependent individual whose self-esteem or contentment with life was connected to the strength of her relationship with her husband. It would be unlikely that she would have been so depressed with her husband's infidelities that she would try to kill herself and her child. By all means, I am not indicating that she did or did not commit the offenses for which she is charged. Rather, in assessing motive for the alleged offense, this information may be relevant for a jury to consider."

¶ 7    On April 12, 2010, the court held another hearing on the State's motion. The State reiterated its view that Dr. Frumkin's opinion constituted inadmissible character evidence. Defendant argued that the testimony was admissible to rebut the State's evidence regarding defendant's motive. In response, the court stated:

"[I]t seems to be that Dr. Frumkin is putting in character evidence. He's basically saying \*\*\* that [defendant] doesn't have the character, based on her—she wasn't the type of person based on herself [*sic*] esteem or contentment with life that she would commit these crimes, and I think that's what it comes in to. It's coming in as character evidence and you can call it whatever you want because he even says here, I'm not saying she did or didn't do it, I'm just saying that 'she doesn't have the character to commit this act based on her—any self esteem issues that she may have.' "

The court ultimately granted the State's motion, stating, "I believe under Illinois law, it's not allowed. I may be wrong."

¶ 8    In April 2012, defendant filed a motion *in limine*, seeking to preclude the State from eliciting testimony from Grady Garner, defendant's husband, regarding telephone conversations between defendant and Grady in the hours immediately before the time when defendant allegedly killed Kierra and attempted to commit suicide. During the conversations, Grady allegedly told defendant that he wanted a divorce. In her motion, defendant, citing section 8-801 of the Code of Civil Procedure (735 ILCS 5/8-801 (West 2012)), claimed that the contents of these conversations were shielded by Illinois's spousal privilege statute. In response, the State argued that the conversations were not privileged because they fell within a statutory exception to the privilege for cases "where the custody, support, health or welfare of [the spouses'] children or children in either spouse's care, custody or control is directly in issue." *Id.* The court denied the motion on September 6, 2012, stating, "I think there is—this falls within the exception of the disqualification regarding where the interest of child or children is affected."

¶ 9    On March 10, 2014, defendant filed a motion *in limine*, seeking to bar the State from eliciting alleged hearsay testimony from other witnesses regarding statements that defendant's mother, Princess Oden, made to paramedics responding to Oden's 9-1-1 call. Immediately before trial, the State explained that it would elicit testimony from Jack Daley, a responding paramedic, to the effect that (1) Oden told Daley when he arrived that she was "the grandmother or mother," (2) Daley told Oden that Kierra was dead but defendant was still alive and asked Oden whether there was anything the paramedics could give defendant, and (3) Oden said in response "she killed the baby." After the State's proffer, the court denied defendant's motion, stating "[t]hat will be allowed."

¶ 10     At trial, Grady testified that he was a traveling anesthesiologist admitted to practice in Arizona and California. On January 1, 2006, Grady left for a business trip to California. On January 5 at around 2:20 a.m., Grady received a phone call from defendant. During the 20-minute conversation that ensued, Grady and defendant discussed their relationship. Grady told defendant that the relationship "had run its course" and that their "marriage was ending." Defendant hung up and called back "right away." According to Grady, during the second call, which lasted approximately 45 minutes, defendant expressed a desire to work through her and Grady's problems. Grady made it clear to defendant that their marriage was "pretty much over" and that they were going to get a divorce. Defendant hung up again and called back a short time after. During the third call, which lasted roughly one minute, defendant asked Grady " 'it is over then, right?' " to which he responded " 'yes.' "

¶ 11     Brenda Bailey testified that she worked as a 9-1-1 dispatcher for the Dolton police department. On January 5, 2006, at approximately 1:35 p.m., Bailey fielded a call from defendant's mother, Princess Oden. During the call, a recording of which is in the record, Oden told Bailey that her granddaughter was dead and that she thought her daughter was also dead, and stated "they had took an overdose."

¶ 12     Randy Manns testified that he worked as an operations manager for Bud's Ambulance. Manns heard Oden's 9-1-1 call on his radio and responded in his personal vehicle. When he arrived at defendant's house, he was met by Oden, who told him " 'they are in the house.' " Manns went inside the house and saw defendant and Kierra lying on a bed. Manns assessed Kierra and determined that she was not breathing, did not have a pulse, and her lips and fingers were blue.

¶ 13     Jack Daley testified that he was a paramedic who responded to Oden's 9-1-1 call. Once inside the house, he overheard Oden speaking to an unidentified man. According to Daley, Oden was "very upset" and said to the man " 'she killed my baby' " and " 'I can't believe she would do this. I can't believe she did this.' " Once the paramedics determined that defendant was still alive, Daley told Oden that he needed her help so that the paramedics could treat defendant. In response, Oden told Daley that she could not believe that " 'she did this.' " In addition, Oden told Daley that defendant was " 'extremely upset' " defendant's husband had asked for a divorce the previous night.

¶ 14     Officer David Graham testified that he was a patrol officer with the Dolton police department. Officer Graham came to defendant's house in response to Oden's 9-1-1 call. When he arrived at the scene, Officer Graham performed a perimeter walk of defendant's home. He testified that he did not observe any signs of forced entry into the home.

¶ 15     Dr. Eric Eason testified that he reviewed Kierra's autopsy report. According to Dr. Eason, a toxicology analysis revealed the presence of amitriptyline, a "powerful" antidepressant, in Kierra's blood, liver, brain, spleen, and kidneys. In addition, the analysis showed the presence of nortriptyline, a metabolite of amitriptyline, in Kierra's bile, central blood, liver, brain, spleen, and kidney. Dr. Eason testified that Kierra's cause of death was amitriptyline overdose and that her manner of death was homicide.

¶ 16     Dr. Nadar Beshay testified that he was a physician at Ingalls Hospital. On January 5, 2006, defendant was admitted to the emergency room at Ingalls and transferred to the intensive care unit, where Dr. Beshay served as her attending physician. When defendant arrived in intensive care, she was in a coma and responsive only to "pain for the stimuli." Toxicology tests were performed on the defendant. Records of the tests were stipulated to at trial. These showed the

presence of amitriptyline in defendant's blood and urine. Dr. Nadar treated defendant for an amitriptyline overdose. The treatment was successful, and the next day defendant came out of her coma and became responsive.

¶ 17　　Pamela Schmisek testified that she worked as a nurse at Ingalls Hospital. On January 5, 2006, defendant was assigned to Schmisek's unit. At that time, defendant was comatose. The next day, defendant was "in and out" of a coma and "confused." The following day, Schmisek went to check on defendant and noticed that she was crying. Schmisek asked defendant "if she wanted to talk about it." In response, defendant "said she thought her daughter was dead." Schmisek asked defendant why she thought that. According to Schmisek, defendant "said that her daughter had told her her heart hurt because her daddy didn't love her anymore, and she said that she comforted her daughter and told her that everything would be okay." In addition, Schmisek recalled defendant stating that she "had given her daughter some pills and took some pills herself and then lay down together." After defendant said that, Schmisek spoke to a police officer posted outside of defendant's room.

¶ 18　　Detective Darryl Hope testified that he worked as a patrolman with the Dolton police department in January 2006. On January 6, 2006, Detective Hope was assigned to sit watch by defendant's room at Ingalls Hospital. On January 7, Detective Hope was sitting in defendant's room watching television with her. He observed that defendant was coherent and "responding quite well." At some point, defendant began conversing with Detective Hope. Defendant told Detective Hope that she was married and worked as an accountant. She explained that her husband was a doctor who traveled frequently and that he had not been home for Thanksgiving, Christmas, or New Year's Day. Continuing, defendant told Detective Hope that she found dinner receipts in her husband's clothes and she believed he was having an affair.

¶ 19　　Defendant then told Detective Hope about the night before she went to the hospital. According to Detective Hope, defendant said that she was home alone with Kierra and "was feeling alone." Kierra came into defendant's bedroom to cheer up defendant by making silly faces and bringing the family puppy. Defendant told Kierra that she felt alone, and "Kiyara [*sic*] said that you wasn't alone because you are with me." Kierra then said "that she didn't want [defendant] to die." In response, defendant told Kierra that " 'everybody has to die sometime.' " In response, Kierra said, " 'Mommy, if you go, I want to go with you.' "

¶ 20　　According to Detective Hope, defendant then said to him that "she didn't mean to do it" and that "she just didn't see no other way." After the conversation, Detective Hope told Detective Kevin Rene, who was in charge of the investigation, that defendant was awake and talking.

¶ 21　　Officer Bolden Jones testified that he worked as the supervisor of the Dolton police department's investigations unit in 2006. On January 8, 2006, Officer Jones and Detective Rene went to Ingalls Hospital to interview defendant. Officer Jones asked defendant what was the last thing that she remembered. In response, defendant stated that she and her husband were having marital problems and that she had been sad the previous day. Defendant recalled sitting on her bed when Kierra came in and said " '[m]om, don't be sad' " and went to get their puppy.

¶ 22　　While defendant and Kierra played with the puppy, they began talking about death. According to Officer Jones, defendant said, " '[y]ou know, everyone dies.' " In response, Kierra told defendant, " ' "I don't want you to die" ' " and then said, " ' "[w]ell mom, if you die, I want to go with you." ' "

¶ 23    Defendant testified in her own defense. According to defendant, around 7 p.m. on January 4, she spoke to Grady about his trip to California. Grady hung up during the call. Defendant tried calling back but could not get through, so she called Oden. Afterwards, defendant got Kierra ready for bed. Around 10 p.m., Kierra asked if she could sleep with defendant in defendant's bedroom. Defendant refused and put Kierra in a different bedroom. The last thing defendant remembered before waking up in the hospital was saying "I love you" to Kierra. Defendant testified that she did not recall having a phone conversation with Grady on January 5, and she also did not recall any of the conversations with hospital staff and police officers regarding her marriage and the overdose incident. In addition, she denied that she was worried about her marriage.

¶ 24    The jury found defendant guilty, and the court sentenced her to 35 years' imprisonment. This appeal followed.

¶ 25                                    ANALYSIS

¶ 26    We first consider whether the trial court erred by granting the State's motion *in limine* to bar Dr. Frumkin's opinion testimony about the likelihood that defendant committed murder based on his psychological evaluation of defendant. We review this issue for plain error because defendant did not raise this issue in her posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

¶ 27    Defendant contends that the trial court's decision constitutes second-prong plain error. The second prong of the plain-error doctrine allows courts to consider an unpreserved error, regardless of how close the evidence was, when the error was "clear or obvious" and "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 28    The first step in the plain-error analysis is to determine whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19. The trial court barred Dr. Frumkin's testimony based on its belief that his opinion constituted character evidence. In her appellate brief, defendant repeatedly emphasizes that Dr. Frumkin was going to offer *expert* testimony "made to a high degree of psychological certainty." However, defendant ultimately concedes that the sum of Dr. Frumkin's opinion was that "[defendant] lacked *the personality traits* to attempt suicide or murder in the wake of her husband's infidelities." (Emphasis added.) Defendant has thus conceded that Dr. Frumkin's opinion was character evidence. See Black's Law Dictionary 636 (9th ed. 2009) (defining character evidence as "[e]vidence regarding someone's general personality traits or propensities").

¶ 29    When the trial court ruled on the motion *in limine*, whether a criminal defendant could introduce evidence showing that he had a pertinent character trait was a rule governed by judicial precedents. See, *e.g.*, *People v. Lewis*, 25 Ill. 2d 442, 445 (1962) ("A defendant in a criminal action can make proof of such previous good character as is inconsistent with the commission of the crime with which he is charged."); *People v. Flax*, 147 Ill. App. 3d 943, 951 (1986) ("The defendant in a criminal case may introduce evidence of his good character in order to establish that his character traits are inconsistent with the commission of the crime charged ***."). Also, when the trial court barred Dr. Frumkin's testimony, a defendant could enter character evidence only "by introducing evidence of his general reputation for the specific character trait." *Flax*, 147 Ill. App. 3d at 951. Defendants were not permitted to introduce character evidence through opinion testimony, including expert testimony. *People v.*

- 6 -

*Randall*, 363 Ill. App. 3d 1124, 1131 (2006) ("[A] defendant may introduce evidence of his or her good character or personality through 'general reputation' evidence but not expert personal opinion testimony."). The trial court therefore correctly applied the law as it stood at the time of its ruling.

¶ 30    However, after the court ruled on the motion *in limine*, but before the case went to trial, the Illinois Supreme Court adopted the Illinois Rules of Evidence. The rules became effective on January 1, 2011. Rule 405(a) abrogated the prior rule prohibiting defendants from introducing character evidence through opinion testimony and instead expressly permitted the practice. The rule states: "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation, or by testimony in the form of an opinion." Ill. R. Evid. 405(a) (eff. Jan. 1, 2011). The defendant never asked the trial court to reconsider its ruling barring Dr. Frumkin's testimony after Rule 405(a) became effective.

¶ 31    Because the trial court's April 2010 ruling was consistent with controlling Illinois law in effect at the time the court made its ruling and defendant did not ask the court to reconsider that decision once Rule 405(a) became effective, defendant's plain-error argument fails.

¶ 32    Even if we assumed the incorrectness of the trial court's decision, defendant's plain-error argument would still fail. To justify reversal under the second-prong of the plain-error doctrine, the error at issue must be so serious that it compromised "the integrity of the judicial process." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Generally, Illinois courts have refrained from applying that label to trial errors except when (1) the error is structural or (2) as a result of the error, the defendant suffers a total or near-total deprivation of a constitutional right, such as when a defendant is convicted of an offense that is not a lesser-included offense of the charged offense. See *People v. Clark*, 2016 IL 118845, ¶ 47.

¶ 33    Here, the trial court's decision to grant the State's motion and bar Dr. Frumkin's testimony does not fall within any recognized category of structural error, such as "trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, [or] a defective reasonable doubt instruction." *People v. Thompson*, 238 Ill. 2d 598, 609 (2010). Instead, the alleged error here was simply a routine trial error that Illinois courts have routinely deemed nonstructural. See, *e.g.*, *id.* at 611 ("Although compliance with Rule 431(b) is important, violation of the rule does not necessarily render a trial fundamentally unfair or unreliable in determining guilt or innocence."); see also *People v. Glasper*, 234 Ill. 2d 173, 213-14 (2009) (improper comment by prosecutor during closing argument did not constitute second-prong plain error). Accordingly, we find that the error at issue was not structural.

¶ 34    We similarly find that the error at issue here did not have the effect of depriving defendant of a constitutional right. See *Clark*, 2016 IL 118845, ¶ 47 (convicting a defendant of an offense that is not a lesser-included offense of the charged offense constitutes second-prong plain error because such a conviction "violates a defendant's fundamental due process right to notice of the charges brought against him" (internal quotation marks omitted)). Defendant contends that her right to a fair trial was violated, but the record does not support that claim. Defendant was permitted to cross-examine the State's witnesses; she testified in her own defense, during which time she testified about her character traits; and, notably, the trial court's order did not cut off all other avenues by which defendant could have presented evidence regarding her character. We have thoroughly reviewed the record and are satisfied that defendant received a fair trial. Accordingly, her second-prong plain-error claim fails. See *People v. Johnson*, 238 Ill.

2d 478, 484 (2010) (noting that the plain-error doctrine "is intended to ensure that a defendant receives a fair trial, but it does not guarantee every defendant a perfect trial").

¶ 35    Defendant further claims that her trial attorney's failure to preserve this issue for appellate review by raising it in her posttrial motion constitutes ineffective assistance of counsel. To establish ineffective assistance of counsel, defendant must show that trial counsel's performance was deficient and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

¶ 36    Defendant's ineffective assistance claim fails both prongs of the *Strickland* analysis. First, as explained above, the trial court's ruling was correct. Moreover, the State presented a sufficiently strong case such that it is unlikely that the outcome at trial would have been different had Dr. Frumkin been permitted to testify. The evidence showed that defendant and Kierra were found lying on the same bed, that both had ingested amitriptyline, and that both had overdosed as a result. The evidence further revealed that defendant made inculpatory statements to nurse Schmisek and Detective Hope. Specifically, after Schmisek observed defendant crying in her hospital room, defendant told Schmisek that she gave Kierra some pills, took some pills herself, and then they both laid down on a bed. Similarly, Detective Hope testified to a conversation that he had with defendant while in her hospital room wherein defendant said she "didn't mean to do it" but that she "just didn't see no other way." Based on this evidence, we find that defendant cannot establish that she was prejudiced by trial counsel's allegedly deficient representation. Her ineffective assistance of counsel claim therefore fails.

¶ 37    Defendant also argues that the trial court erred by failing to conduct a *Frye* hearing with respect to Dr. Frumkin's testimony. This argument is meritless. To begin, defendant never asked the trial court to hold a *Frye* hearing. Defendant has therefore arguably forfeited this issue. Leaving that aside, the purpose of a *Frye* hearing is to determine the general admissibility of expert testimony by gauging the scientific validity and reliability of the methodology's underlying opinion. But even if Dr. Frumkin's testimony satisfied *Frye*, the fact remains that his proposed testimony existed in the form of an expert *opinion* regarding defendant's character traits and was thus inadmissible under clearly established law at the time. *Randall*, 363 Ill. App. 3d at 1131.

¶ 38    We next consider defendant's claim that the court erred by denying her motion *in limine* to bar the State from eliciting testimony from Grady about conversations he and defendant had early in the morning on January 5, 2005, regarding the status of their marriage. Defendant specifically argues that this testimony was admitted in violation of the marital communication privilege statute. Illinois's marital communication privilege is contained in section 115-16 of the Code of Criminal Procedure of 1963 and provides as follows:

>    "In criminal cases, husband and wife may testify for or against each other. Neither, however, may testify as to any communication or admission made by either of them to the other or as to any conversation between them during marriage, except in cases in which either is charged with an offense against the person or property of the other, in case of spouse abandonment, when the interests of their child or children or of any child or children in either spouse's care, custody, or control are directly involved, when either is charged with or under investigation for an offense under Section 11-1.20, 11-1.30, 11-1.40, 11-1.50, 11-1.60, 12-13, 12-14, 12-14.1, 12-15, or 12-16 of the Criminal Code of 1961 or the Criminal Code of 2012 and the victim is a minor under 18

years of age in either spouse's care, custody, or control at the time of the offense, or as to matters in which either has acted as agent of the other." 725 ILCS 5/115-16 (West 2014).

¶ 39    As noted above, the trial court denied defendant's motion *in limine* on the basis that the conversations at issue fell within the statutory exception applicable "when the interests of their child or children or of any child or children in either spouse's care, custody, or control are directly involved." *Id.* Defendant claims that this decision was erroneous. Defendant argues that the section 115-16 exceptions—in this case, the child exception—can only apply when the content of the conversation or communication at issue actually relates to the subject matter to which the particular exception is directed. From that premise, defendant reasons that, since she and Grady did not talk about Kierra during their phone call, the child exception did not apply and the trial court accordingly erred by denying her motion *in limine*.

¶ 40    This issue presents an issue of statutory construction which we review *de novo*. *People v. Chenoweth*, 2015 IL 116898, ¶ 20. When construing statutes, our objective is to give effect to the legislature's intent, the best evidence of which is the text of the statute itself. *People v. Trzeciak*, 2013 IL 114491, ¶ 40.

¶ 41    We reject defendant's proposed construction of section 115-16. None of the section 115-16 exceptions contain any textual directive requiring courts to look to the content of a communication or conversation to determine whether an exception applies. Instead, the legislature drafted section 116-15 so that its exceptions would apply in specific circumstances. That much is evident from the plain text of the exceptions, which by their terms apply in "cases," "matters," and, as particularly relevant here, "when," due to the nature of the proceeding at hand, the "interests" of the spouse's children are "directly involved."

¶ 42    Defendant's arguments to the contrary are unpersuasive. Defendant contends that her reading of the section 115-16 child exception is preferable because the State's construction would "uncontrollably expand[ ] the exception" to any case in which a parent is convicted of a crime, since "a child always has some interest in whether her parent becomes a convicted criminal and faces a prison." That argument, however, is at odds with the text of the child exception, which by its plain terms clearly and unambiguously applies only when, due to the nature of the proceeding, the child's interests are "directly involved." 725 ILCS 5/115-16 (West 2014).

¶ 43    Left to be determined is whether this case actually implicated the child exception. Put another way, we must determine whether Kierra's "interests" were "directly involved" in this case. 725 ILCS 5/115-16 (West 2014). Defendant does not explicitly argue that Kierra's "interests" are not "directly involved" in this case because she is dead, but that is the thrust of her argument in her reply brief that "Kierra's future and upbringing were not at issue in *** the case as a whole." This court rejected a similar argument in *People v. Eveans*, 277 Ill. App. 3d 36 (1996). In *Eveans*, a mother was convicted of murdering two of her young children. *Id.* at 39. Before trial, the defendant, invoking the marital privilege, filed a motion to suppress statements she made during a conversation with her former husband. The trial court denied the motion, and during trial, the husband testified that the defendant told him that she killed one of the children by suffocation. *Id.* at 40. On appeal, the defendant argued that the trial court erred by admitting her statements that she made to her husband. She specifically reasoned that, since the children were dead, they had no interest in the case. *Id.* at 43-44.

¶ 44    This court unequivocally rejected that argument, explaining:

"When a child is murdered by a parent the State stands in its place to serve several continuing interests directly involved in a criminal prosecution of that parent for murder: the interest in seeing the murderer brought to justice, the interest in protecting other children from violent acts of physical abuse committed by the same defendant, and the interest in deterring similar behavior in other potentially abusive parents." *Id.* at 44.

¶ 45    Here, like the child victims in *Eveans*, Kierra's murder was the direct subject of the case. And, just as in *Eveans*, the State in this case stood in for Kierra to advance her continuing interest in seeing justice done. Accordingly, we hold that Kierra's interests are "directly involved" in this case. See *id.* at 45 ("[T]he paramount concern of the child interest exception [is] the welfare of the children."). Accordingly, the trial court's decision on this issue was not erroneous.

¶ 46    Defendant's arguments to the contrary are unpersuasive. Defendant attempts to distinguish *Eveans* on the basis that the substance of the spousal conversation at issue in *Eveans* directly related to the child's murder, while the conversation in the present case did not. True enough, but that is a distinction without a difference because, as we have explained, the child exception—as with the other exceptions of section 115-16—is triggered based on the nature of the case and not the substance of the communication at issue.

¶ 47    Equally unavailing is defendant's suggestion that a child's interest cannot be directly involved in a case in which a parent is being prosecuted for their child's murder because the child, being dead, no longer has any interests. This view of the law would illogically elevate the marital privilege to its zenith at the precise moment when the marital relationship—the very source from which the privilege's justification flows—is at its lowest ebb. See *id.* ("Once a spouse has committed an abusive act against a child, the damage to marital harmony has already been done."). Moreover, taking defendant's view of the law to its natural conclusion would result in the exception applying when the child survived an attack by a parent, since the child, being alive, would retain an interest in the case, but not in cases where the parent succeeded in murdering the child. We doubt the legislature intended to afford parents with an evidentiary shield in cases where they killed their children, but not when they seriously injure them.

¶ 48    Finally, we consider defendant's claim that the trial court erred by denying her motion *in limine* seeking to bar the State from introducing Oden's statements to paramedic Daley, that "she killed my baby," "I can't believe she would do this," and "I can't believe she did this." We review this issue for plain error because defendant did not raise this issue in her posttrial motion. *Enoch*, 122 Ill. 2d at 186. Defendant's plain-error argument is limited to first-prong plain error. Under the first prong of the plain-error doctrine, we may review an unpreserved error if " 'the evidence is close, regardless of the seriousness of the error.' " *Piatkowski*, 225 Ill. 2d at 564 (quoting *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). As with second-prong plain error, the first step when dealing with a claim of first-prong plain error is to determine whether an error occurred. *Eppinger*, 2013 IL 114121, ¶ 19.

¶ 49    The court initially ruled that the State would be permitted to ask Daley about what Oden said to him only to impeach Oden if the State called Oden to testify. On the first day of the trial, the court reversed itself and allowed the State to elicit testimony from Daley regarding what Oden said to him. The court did not give an explanation for its ruling. In their respective briefs,

- 10 -

however, defendant and the State have analyzed the court's ruling as if the testimony at issue was admitted pursuant to the excited utterance exception.

¶ 50    The excited utterance exception is codified in Rule 803(2), which states: "[t]he following are not excluded by the hearsay rule, even though the declarant is available as a witness: *** [a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ill. R. Evid. 803(2) (eff. Jan. 1, 2011). The rules governing the admissibility of out-of-court statements pursuant to the excited utterance exception are well-settled. For such statements to be admissible, there must be (1) an event that is "sufficiently startling to produce a spontaneous and unreflecting statement," (2) the statement must have been made closely after the event such that the declarant did not have time to contemplate his or her words and create a fabrication, and (3) the statement must relate to the event. *People v. Lerma*, 2016 IL 118496, ¶ 5 n.1; see *People v. House*, 141 Ill. 2d 323, 381 (1990).

¶ 51    However, "there is a caveat to the spontaneous declaration exception of the hearsay rule that the declarant must have had an opportunity to observe personally the matter of which he speaks." *People v. Hill*, 60 Ill. App. 2d 239, 248 (1965). In *Hill*, the court held it was improper to admit testimony from a father who exclaimed that his daughter had been raped. The daughter was raped in her car when it was parked at a country club. The daughter, and a friend who was also attacked, left the country club and went directly home where they told the father what had occurred. The father then made his exclamation (" 'Sharon has been raped. Call the cops ***.' "). *Id.* These facts demonstrated that the father did not actually witness the rape. The court held that the father's statement was inadmissible, because the declarant must have actually witnessed the event which gave rise to the excited utterance. *Id.* Even so, "it is sufficient if it appears inferentially that the declarant personally observed such matters and that there is nothing to make a contrary inference more probable." *People v. Poland*, 22 Ill. 2d 175, 183 (1961).

¶ 52    We cannot make such an inference here. Seeing two close family members apparently dead would be "sufficiently startling to produce a spontaneous and unreflecting statement." However, the "startling event" for purposes of Rule 803(2) here is not Oden's walking into the house and seeing her granddaughter dead and daughter comatose in the bedroom, but rather the daughter's administration of the deadly pills to Kierra. It is the latter act which formed the basis for the defendant's murder conviction. The record is bereft of any evidence that Oden saw her daughter administer the drugs to Kierra. Accordingly, Oden's statement was inadmissible, even as an excited utterance. See *id.*

¶ 53    We must, therefore, determine whether the introduction of this inadmissible testimony was plain-error. We find that the error did not constitute first-prong plain error because the evidence was not closely balanced. As noted above, defendant and Kierra were found on the same bed, had ingested overdose quantities of the same drug, and defendant made inculpatory statements to nurse Schmisek and Detective Hope.

¶ 54    Similarly, we find that the error did not constitute second-prong plain error because the erroneous admission of the testimony at issue did not completely deprive defendant of her right to a fair trial. Notably, the State did not refer to Oden's out-of-court statement during its opening statement or principal closing argument. In fact, during principal closing argument, the prosecutor argued that "the only testimony about what [Oden] said" on January 5, 2006, was from the tape of Oden's 9-1-1 call. During rebuttal closing argument, after providing a

lengthy summary of the circumstantial evidence implicating defendant, the State referred in passing to "when the paramedics testified about what [Oden] said when she was hysterical." The prosecutor never directly repeated Oden's hearsay statement. In short, the erroneous admission of Oden's statement does not remotely resemble any of the errors we have deemed structural, and the error likewise did not compromise Oden's right to a fair trial. Accordingly, we reject Oden's second-prong plain-error argument.

¶ 55    Finally, we reject defendant's contention that trial counsel's failure to preserve this issue by raising it in her posttrial motion constituted ineffective assistance of counsel. We have already explained that the evidence in this case was not closely balanced. Thus, even assuming that trial counsel was, in fact, deficient in this regard, we do not believe that the outcome at trial would have likely been different had Oden's statements not been admitted. Accordingly, defendant's ineffective assistance of counsel claim fails.

¶ 56                                         CONCLUSION
¶ 57    For these reasons, we affirm defendant's conviction.

¶ 58    Affirmed.