2024 IL App (4th) 240187

NO. 4-24-0187

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 24, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| JESSE J. WRIGHT, | ) | No. 22CF318 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Rudolph M. Braud Jr., |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Harris and DeArmond concurred in the judgment and opinion.

**OPINION**

¶ 1  Defendant, Jesse J. Wright, appeals an order granting the State's petition to detain him before trial pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2022)), hereinafter as amended by Public Act 101-652, § 10-255 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act (Act). See Pub. Act 102-1104, § 70 (eff. Jan. 1, 2023) (amending various provisions of the Act); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (lifting the stay on the pretrial release portions of the Act as of September 18, 2023). For the following reasons, we affirm.

¶ 2          I. BACKGROUND

¶ 3  On April 13, 2022, a grand jury returned an indictment charging defendant with six offenses, all of which pertained to possessing a gun illegally and shooting William Thompson on

September 1, 2021. Specifically, the indictment alleged attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(2) (West 2020)), armed habitual criminal (720 ILCS 5/24-1.7 (West 2020)), two counts of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2020)), aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2020)), and unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1 (West 2020)). Defendant did not post bond.

¶ 4        On December 4, 2023, defendant filed a motion to determine appropriate conditions of pretrial release pursuant to section 110-7.5(b) of the Code (725 ILCS 5/110-7.5(b) (West 2022)). A docket entry that day indicates the trial court continued the matter for a status hearing on December 19, 2023.

¶ 5        On December 6, 2023, the State filed a petition to deny defendant pretrial release. See 725 ILCS 5/110-6.1(a)(1), (1.5), (6)(A), (6)(D), (6)(O), (7) (West 2022) (authorizing defendant's detention under the "dangerousness" standard). The petition alleged that on September 1, 2021, defendant was on mandatory supervised release after serving a seven-year prison sentence for being an armed habitual criminal. Defendant's other criminal history included (1) a 2012 burglary conviction, for which he was sentenced to six years in prison; (2) a 2012 residential burglary conviction, for which he was sentenced to six years in prison; and (3) another 2012 residential burglary conviction, for which he was sentenced to six years in prison. The State incorporated a factual basis for the charges. We will not recite that factual basis, as the State later amended its petition to include a much more detailed proffer.

¶ 6        A December 19, 2023, docket entry indicates the parties' competing pretrial release petitions were both "heard, argued and continued" to January 19, 2024. Inexplicably, another docket entry from December 19, 2023, indicates that defendant's motion for pretrial release was "heard, argued, and denied," and the matter was set for a "status hearing" on January 19, 2024.

This docket entry made no mention of the State's petition to detain defendant. The record does not contain a report of proceedings from December 19, 2023.

¶ 7    On December 27, 2023, the State filed an amended petition to deny defendant pretrial release.

¶ 8    According to the amended petition, around 10:41 p.m. on September 1, 2021, a "Shot Spotter" system alerted that 12 shots were fired near 1415 East Cornell Street in Springfield. Citizens also called to report that someone had been shot. Police officers located Thompson, "who had been shot multiple times in the head while he was sitting in the driver's seat of his vehicle which was parked in the driveway near the residence of 1415 Cornell Street." There were projectile holes in the windows and doors of Thompson's vehicle, and officers found 12 "shell casings" in the area.

¶ 9    Thompson was taken to a hospital for treatment. He sustained "three gunshots to the head, with approximately six total entry and exit wounds." He underwent multiple surgeries to treat skull fractures, and he lost both eyes.

¶ 10    Police officers collected video footage from surveillance cameras near the shooting, including from Felber's Tavern. Footage from this tavern "depicted events from approximately 9:45 p.m. to 10:49 p.m. on September 1, 2021 at or near 1415 East Cornell, including the shots fired at approximately 10:45 p.m." This video footage also showed a GMC Acadia "parking in the area of the shooting near [a specified address] on Fourteenth Street at approximately 10:29 p.m." Officers identified "various witnesses who heard shots fired."

¶ 11    Officers later identified Christina Wright-Brown as "an individual who had been in an argument with the victim earlier" on September 1, 2021. That evening, Christina was at the home of her sister, Dawn Brown, at the address on 14th Street referenced in the preceding

paragraph. Dawn's home was visible in the surveillance footage from the tavern. According to video footage, Christina arrived around 10:06 p.m. in a sedan.

¶ 12 Detective Lindzee Carpenter first spoke with Christina on September 7, 2021, at Christina's residence. Christina told Carpenter the following about the events of September 1, 2021. She was sitting in her vehicle alone near Dawn's residence, "when suddenly her front passnger [*sic*] door opened and an unknown male was standing there." Although Christina "did not remember much," "words were exchanged and she demanded that he close her door." Christina "vaguely remembered that he threatened to have his daughter batter her." Dawn's boyfriend, Christopher Berry, arrived. Christina spoke to Berry about "the incident" and then entered Dawn's residence.

¶ 13 Carpenter interviewed Dawn on September 8, 2021. Dawn related the following about the events of September 1, 2021. Christina knocked on her door and entered her residence to use the bathroom. Christina told Dawn she "was in a verbal argument with a male who opened the car door." While they were inside the residence, both Christina and Dawn "heard several gunshots." Upon looking outside, Dawn "realized that the person who was shot was her neighbor and that this person was the one Christina had 'got into it with.'" Dawn related to Carpenter that Christina had two vehicles: a GMC Acadia and a Chevrolet Malibu. Carpenter had seen those vehicles the day before when she interviewed Christina.

¶ 14 On September 13, 2021, Carpenter obtained a search warrant for records associated with Dawn's phone number. Records returned in connection with that search warrant showed calls from Christina's number on September 1, 2021.

¶ 15 On November 15, 2021, Carpenter interviewed Christina again. Christina said she was afraid of defendant, who was her boyfriend. Christina did not consent to this interview being

recorded. Christina told Carpenter the following. She called defendant "after the argument with William Thompson." She told defendant she " 'got into it with a guy.' " Defendant drove Christina's GMC Acadia to the location of the shooting. Defendant was the shooter. During the shooting, defendant stood near the garage of Dawn's residence. Christina and defendant are "the only people who drive her GMC Acadia." After the shooting, defendant "hid the firearm outside and later took it to Chicago to get rid of it." Christina provided defendant's telephone number to Carpenter.

¶ 16　　　Records obtained pursuant to a search warrant associated with Christina's phone number showed her phone made a call to defendant's phone at approximately 10:03 p.m. on September 1, 2021. Christina's phone received calls from defendant's phone at approximately 10:18 p.m. and 10:45 p.m. Christina's phone also made calls to Dawn's phone at approximately 10:15 p.m. and 10:34 p.m.

¶ 17　　　On January 18, 2022, Detective Timothy Zajicek used "Zetz Trax software" to map cell phone records associated with phones belonging to Christina, Dawn, and defendant. Zajicek "determined all three sets of records placed associated devices with those numbers in an area that covered the scene of the shooting around the time of the shooting."

¶ 18　　　Christina submitted to a recorded interview on March 18, 2022. She told Carpenter the following about the events of September 1, 2021. She and the victim of the shooting "were in a verbal altercation where he opened her car door and threatened to have his daughter batter her." She called defendant, who was her husband, and told him she just " 'got into it with a guy.' " Defendant responded by saying either " 'okay' " or " 'I'm on my way.' " Approximately 30 minutes later, defendant arrived in Christina's truck as Christina was sitting on Dawn's porch. This startled Christina, as she did not know defendant was coming there. When she asked defendant

what he was doing, he "told her to go inside." Christina entered Dawn's residence and turned off the porch light. Christina heard gunshots as she was explaining to Dawn "what had happened in the altercation." After the shooting, defendant "called her and told her to get home." This concluded the State's factual proffer.

¶ 19 The record contains a transcript of the January 19, 2024, proceedings. At the beginning of the proceedings, the trial court said this was a continued hearing from December 19, 2023, and that the State in the interim had filed an amended petition to detain defendant. The prosecutor added that "when we adjourned last time," defense counsel "wanted to present further proof" as to whether defendant was married to Christina on September 1, 2021. According to the prosecutor, defense counsel tendered a certified document indicating defendant and Christina were married in July 2021. The prosecutor also recounted that when they adjourned on December 19, 2023, the State intended to add information to its detention petition in response to defendant's claim regarding "potential marital privilege." See 725 ILCS 5/115-16 (West 2022) (establishing that although spouses may testify for or against each other, subject to certain exceptions, they may not "testify as to any communication or admission made by either of them to the other or as to any conversation between them during marriage"); *People v. Trzeciak*, 2013 IL 114491, ¶ 42 (clarifying that this privilege "applies only to communications which are intended to be confidential").

¶ 20 The prosecutor proposed that marital privilege did not affect this detention hearing, as the State was not prosecuting defendant based solely on evidence that would be subject to the privilege. As an example, the prosecutor explained that Christina could testify about things she saw and heard, other than what defendant said to her. Christina could also testify as to what defendant's phone number was, as that was not a "confidential" communication between spouses.

For purposes of the detention hearing, the prosecutor maintained the proof was evident and the presumption great that defendant committed "a series of detainable offenses." The prosecutor contended that "the type of offenses" at issue, combined with defendant's "criminal history and the fact that he was already on mandatory supervised release at this time for a *** gun-related offense," showed defendant was a threat to Christina, Thompson, or "the community at large." Given that defendant was on parole when he allegedly committed the offenses at issue, the prosecutor submitted there were no conditions of release that could protect the public. At the trial court's request, the prosecutor recited for the record the factual proffer contained in the State's amended detention petition.

¶ 21 Defense counsel responded as follows. As part of assessing whether the proof was evident or the presumption great that defendant committed the charged offenses, the trial court should consider what evidence is admissible. Counsel acknowledged Christina could testify about what "she saw and heard," other than her conversations with defendant. However, Christina's statements about her conversations with defendant were "core to understanding the State's theory of the case" and were subject to marital privilege. Counsel also contended that it would fall within the scope of marital privilege for Christina to identify defendant's phone number in her testimony. Counsel proposed that the evidence apart from Christina's "statements" was "simply not enough to convict" defendant. According to counsel, because "the weight of the evidence against a defendant is a relevant consideration, when the weight of the evidence is such that no reasonable jury would convict, it is simply not just to require the defendant remain in pretrial detention." Counsel argued that conditions such as global positioning system monitoring, a curfew, house arrest, or residing in a specific location were available alternatives to detention.

¶ 22　　　　The trial court then questioned the prosecutor about whether the State would "still have a prosecutable case" if Christina could not testify about anything defendant told her on September 1, 2021. The prosecutor responded that this would not "make a big difference" because (1) Christina could testify about other things she saw and heard and (2) there was "other forensic evidence showing the individual in the area." The prosecutor added that the State also had "video evidence depicting a male individual firing the shots." The prosecutor further submitted that Christina may have known defendant's phone number before they got married, in which case the privilege would not apply to that aspect of her testimony.

¶ 23　　　　Defense counsel then suggested he could subpoena defendant's phone records to determine when defendant acquired the phone number at issue. Counsel asserted the admissible evidence against defendant was "not great."

¶ 24　　　　The trial court granted the State's petition to detain defendant, reasoning as follows. The narrow focus at this juncture was on whether defendant should be detained or released. Defense counsel should consider filing appropriate motions *in limine*. However, for purposes of the detention hearing, defendant was charged with "a detainable offense," and the State's amended petition complied with the statutory requirements. The State's factual proffer, along with defendant's criminal history and the fact he was on parole when he allegedly committed the charged offenses, was clear and convincing evidence that defendant posed a danger to the community and that "detention is the least restrictive at this point." The written detention order added the additional required finding that the proof was evident or the presumption great that defendant committed a detainable offense.

¶ 25　　　　Defendant filed a timely notice of appeal. One of the issues included in the notice of appeal was that "the Court erred in finding that the proof is evident" defendant committed a

detainable offense, as Christina's inadmissible statements were "central to the State's proffered proof."

¶ 26                                   II. ANALYSIS

¶ 27        The Office of the State Appellate Defender filed a memorandum in support of defendant's appeal. Defendant reiterates his argument that the trial court erroneously determined the proof was evident or the presumption great that he committed a detainable offense. He proposes that the State's burden at a detention hearing includes showing a likelihood of procuring a conviction if the matter proceeds to trial. From this premise, defendant then reasons that (1) his communications with Christina are inadmissible pursuant to marital privilege and (2) "the State's remaining evidence was insufficient to prove guilt beyond a reasonable doubt, let alone show that a conviction was likely."

¶ 28        The State responds that focusing on the prosecution's likelihood of success at trial "completely misses the point of the detention hearing." According to the State, "The goal of the detention hearing was not to ascertain whether defendant will likely be found guilty at trial, but to assess if detention was necessary to achieve a goal and if the proffer supported a finding that defendant committed the alleged detainable offense." The State submits the trial court "properly used its discretion and detained defendant because of the serious threat he posed to the community, streaming from his criminal history and recent criminal behavior." The State argues defendant may file appropriate motions *in limine* "at the proper time."

¶ 29        Pursuant to section 110-6.1(e)(1)-(3) of the Code (725 ILCS 5/110-6.1(e)(1)-(3) (West 2022)), the State bore the burden at the detention hearing to prove three elements: (1) the proof is evident or the presumption great that defendant committed a detainable offense, (2) he poses a real and present threat to the safety of any person or persons or the community, based on

- 9 -

the specific articulable facts of the case, and (3) no combination of authorized conditions can mitigate that threat. Defendant challenges the trial court's findings only with respect to the first element.

¶ 30        We review the trial court's detention decision for an abuse of discretion. *People v. Inman*, 2023 IL App (4th) 230864, ¶ 11. A court abuses its discretion by issuing a decision that is arbitrary, fanciful, or unreasonable—a decision with which no reasonable person would agree. *Inman*, 2023 IL App (4th) 230864, ¶ 10.

¶ 31        Defendant does not dispute he was charged with multiple offenses that made him eligible for pretrial detention. Nor does he seem to dispute that if everything in the prosecutor's proffer could be considered by the trial court, there would be a firm basis for concluding the proof was evident or the presumption great that he committed the charged offenses. Rather, defendant asks us to disregard portions of the proffer he says are inadmissible. Defendant then asks us to review the remainder of the proffer to determine whether such evidence would be sufficient to sustain a conviction. See *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (establishing that when considering a challenge to the sufficiency of the evidence presented at trial, a reviewing court must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt).

¶ 32        Defendant's argument is inconsistent with article 110 of the Code, which governs pretrial release. One of the elements the State must prove at a detention hearing is that "the proof is evident or the presumption great that the defendant has committed" an offense that is eligible for detention. 725 ILCS 5/110-6.1(e)(1) (West 2022). However, section 110-6.1(f) of the Code (725 ILCS 5/110-6.1(f) (West 2022)), which addresses how detention hearings must be conducted, makes clear the State is *not* required to prove at this hearing that it possesses admissible evidence

sufficient to sustain a conviction. The statute expressly provides that "[t]he rules concerning the admissibility of evidence in criminal trials do not apply to the presentation *and consideration* of information at the hearing." (Emphasis added.) 725 ILCS 5/110-6.1(f)(5) (West 2022).

¶ 33    Contrary to what defendant argues, the weight of the admissible evidence against him is merely one part of the calculation, not a prerequisite for detention. A defendant "may not move to suppress evidence" at a detention hearing. 725 ILCS 5/110-6.1(f)(6) (West 2022). With that said, "evidence that proof of the charged crime may have been the result of an unlawful search or seizure, or both, or through improper interrogation, is relevant in assessing the weight of the evidence against the defendant." 725 ILCS 5/110-6.1(f)(6) (West 2022). When evaluating which conditions of pretrial release, if any, can protect the community, a trial court may consider, as one of many factors, "the weight of the evidence against the defendant, except that the court may consider the admissibility of any evidence sought to be excluded." 725 ILCS 5/110-5(a)(2) (West 2022). A court may consider this same factor, as one of many, when determining whether a defendant poses a real and present threat to the community. See 725 ILCS 5/110-6.1(g)(9) (West 2022) (incorporating the factors listed in section 110-5 of the Code, to the extent the court deems such factors "to have a reasonable bearing upon the defendant's propensity or reputation for violent, abusive, or assaultive behavior, or lack of such behavior"). Thus, article 110 of the Code is clear that the weight of the evidence against a defendant is merely one part of the calculus in the detention decision.

¶ 34    This statutory framework makes sense as a practical matter. Pursuant to section 110-6.1(c) of the Code (725 ILCS 5/110-6.1(c) (West 2022)), the State typically must file its detention petition no later than 21 days after a person's arrest, and the trial court must hold a hearing on that petition within 2 days. At such an early stage of the prosecution, the parties likely

have not completed discovery, and the investigation may not even be complete. A court cannot be expected to rule on complicated evidentiary questions as part of a detention hearing, which often takes place at a defendant's first court appearance. Marital privilege is a nuanced doctrine that requires a fact-intensive analysis. See *Trzeciak*, 2013 IL 114491, ¶ 51 ("Whether a particular communication is privileged as having been made in reliance upon the marital confidence depends on the nature and form of the communication and the circumstances immediately surrounding its making. Such a determination is a preliminary question of fact to be decided by the trial court."). Disputes about the applicability of marital privilege are suited to motions *in limine*, where the parties can submit legal memoranda if necessary and develop a factual record.

¶ 35 Here, the State filed its detention petition more than a year and a half after defendant was charged, in response to defendant's motion to reassess the conditions of his release. Nevertheless, as the trial court recognized, the evidentiary arguments defendant raised at the detention hearing needed to be fleshed out in a motion *in limine*. Application of marital privilege is not as clear-cut as defendant assumes. For example, Christina told the police that defendant came to Dawn's house after Christina told him she got into an altercation with the victim. The court would require further context and briefing to determine whether this statement to defendant could be deemed confidential, as Christina apparently conveyed the same information to Dawn (and possibly Berry) around the same time. As another example, defendant argued at the detention hearing that marital privilege precludes Christina from testifying that defendant told her his phone number. However, even assuming this was meant to be a confidential communication, there certainly could be other witnesses who could lay the foundation for admitting defendant's phone records, which placed him near the scene of the shooting. Thus, defendant's argument on this point may or may not end up being an issue at trial. These examples underscore that there was no way

for the court to assess the impact of marital privilege without holding a full hearing devoted to this issue. That far exceeded the scope and purpose of the detention hearing. Accordingly, the court properly declined to make evidentiary rulings at the detention hearing.

¶ 36 Defendant's attempt to incorporate the "*Jackson* standard" into detention decisions is misguided. The *Jackson* standard provides a highly deferential framework for a reviewing court to evaluate a defendant's arguments about reasonable doubt after a fact finder has found the defendant guilty. See *Jackson*, 443 U.S. at 319. The *Jackson* standard is irrelevant to pretrial detention decisions.

¶ 37 Defendant also cites *People v. Wells*, 279 Ill. App. 3d 564, 570 (1996), which held that the State's likelihood of success at trial is a relevant consideration when the State requests for a defendant to be detained while the State takes an interlocutory appeal from an order suppressing evidence. The concerns addressed in *Wells* do not apply here. The defendant in *Wells* had been in pretrial custody for four years while the State took multiple interlocutory appeals. *Wells*, 279 Ill. App. 3d at 565. As explained in *Wells*, it should be the "rare exception" for a defendant to be detained during the potentially lengthy process of an appeal by the State from an order suppressing evidence. *Wells*, 279 Ill. App. 3d at 568. By contrast, an appeal from an order detaining a defendant pursuant to section 110-6.1 of the Code does not deprive the trial court of jurisdiction to continue the proceedings. See Ill. S. Ct. R. 604(h)(6) (eff. Dec. 7, 2023). Subject to certain exceptions, a detained defendant must be released from custody if he or she is not brought to trial within 90 days of the detention order. 725 ILCS 5/110-6.1(i) (West 2022). Furthermore, while a defendant remains detained pursuant to section 110-6.1 of the Code, the trial court must make a finding at each subsequent court appearance that detention remains necessary. 725 ILCS 5/110-6.1(i-5) (West 2022). Given the safeguards in place to protect a defendant who is detained pursuant to

section 110-6.1 of the Code from being detained indefinitely without a trial, *Wells*'s reasoning does not apply here.

¶ 38    Ultimately, we discern no abuse of discretion in the trial court's finding that the proof was evident or the presumption great that defendant committed the charged offenses. The prosecutor presented a detailed factual proffer that reasonably supported the court's finding on this point.

¶ 39                                 III. CONCLUSION

¶ 40    For the reasons stated, we affirm the trial court's judgment.

¶ 41    Affirmed.

---

*People v. Wright*, **2024 IL App (4th) 240187**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Sangamon County, No. 22-CF-318; the Hon. Rudolph M. Braud Jr., Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Carolyn R. Klarquist, and Benjamin Wimmer, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Patrick Delfino and David J. Robinson, of State's Attorneys Appellate Prosecutor's Office, of Springfield, for the People. |

---